**Reversed and Remanded, Suggestion of Remittitur, and Opinion filed December 22, 2015.**



In the

# Fourteenth Court of Appeals

---

## NO. 14-14-00112-CV

---

### DEBRA C. GUNN, MD, OBSTETRICAL AND GYNECOLOGICAL ASSOCIATES, P.A., AND OBSTETRICAL AND GYNECOLOGICAL ASSOCIATES, PLLC, Appellants

### V.

### ANDRE MCCOY, AS PERMANENT GUARDIAN OF SHANNON MILES MCCOY, AN INCAPACITATED PERSON, Appellee

---

**On Appeal from the Probate Court No. 2
Harris County, Texas
Trial Court Cause No. 352,923-401**

---

## O P I N I O N

On September 13, 2004, when she was 37 weeks pregnant, Shannon McCoy presented at the hospital with severe abdominal pain. Her fetus had died due to placental abruption, and Shannon was suffering from disseminated intravascular coagulation (DIC)—a blood clotting disorder. Shannon received blood products,

including fresh frozen plasma (FFP). She delivered the stillborn baby, received additional blood products, not including FFP, and was transferred to the ICU. Shannon continued to lose blood. In the ICU, Shannon developed tachycardia, and her uterus stopped contracting. Shannon underwent a hysterectomy. Just before the surgery, her heart stopped pumping blood and she went into cardiac arrest. CPR was performed. Shannon suffered brain damage and seizures, was transferred to a neurological ICU, and underwent months of therapy. Since September 14, 2004, Shannon has required around-the-clock care as a quadriplegic.

A jury returned a verdict in favor of Shannon through her husband and guardian, appellee Andre McCoy, in his healthcare liability suit against appellants Debra Gunn, MD, Obstetrical and Gynecological Associates, P.A., and Obstetrical and Gynecological Associates, PLLC (together, OGA).[1] The trial court signed a judgment in conformity with the jury's verdict. Gunn and OGA assail the judgment in multiple issues on appeal, challenging: (1) the trial court's granting of McCoy's no-evidence summary judgment on comparative negligence; (2) the legal sufficiency of the evidence to establish that asserted instances of negligent medical treatment proximately caused Shannon's brain injuries; (3) the legal sufficiency of the evidence of Shannon's past medical expenses; (4) the legal sufficiency of the evidence of Shannon's future medical expenses, along with the trial court's refusal to allow evidence from Gunn's and OGA's life care expert; and (5) the trial court's refusal to submit various instructions in the jury charge. Gunn also argues that OGA's indemnity claim is not ripe.

Because the evidence is legally insufficient to support the full amounts awarded for Shannon's future medical expenses, we suggest a remittitur of $159,854.00. *See* Tex. R. App. P. 46.3. We reverse and remand for a new trial;

---

[1] McCoy brought suit against the P.A. entity and later amended to add the PLLC entity.

however, if the remittitur is timely accepted, we instead will modify the trial court's judgment to change the amount of future medical expenses awarded to $7,082,549.00, and affirm the judgment as modified.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Shannon McCoy, a 35-year-old first-time pregnant woman, was under the prenatal care of Dr. Debra Gunn, an obstetrician and gynecologist (ob/gyn) with OGA.  On the morning of September 13, 2004, Shannon went to her 37-weeks prenatal appointment.  That same evening, Shannon presented at the Woman's Hospital (Woman's) with severe abdominal pain and lack of fetal movement.  Dr. Mark Jacobs, the OGA ob/gyn on call, ordered an ultrasound and discovered that the fetus had died due to placental abruption.  Placental abruption occurs when the placenta prematurely detaches from the uterine wall.  Lab tests indicated Shannon had developed DIC, a blood coagulation disorder that puts patients at risk for increased bleeding.  DIC can occur as a result of placental abruption.  Jacobs informed Gunn.  Jacobs also consulted with a maternal-fetal medicine specialist, Dr. Brian Kirshon, who recommended Shannon receive FFP and blood.  The nurses documented a verbal order from Jacobs at 2:18 a.m. on September 14 to provide Shannon with two units of FFP and then two units of packed red blood cells (PRBCs).  Kirshon hoped Shannon's coagulopathy would resolve postdelivery—his plan was to recheck her coagulation studies and to give her blood products as needed.  Kirshon also advised being "on the look out for major postpartum hemorrhage."

Gunn arrived at the hospital at about 4:00 a.m. on September 14 and took over Shannon's care.  Gunn consulted with Kirshon, and they agreed on vaginal delivery.  The stillborn baby girl was born at 6:20 a.m.  Gunn left Shannon to perform a scheduled C-section on another patient, returning later.  The nurses

documented a verbal order from Gunn at 7:20 a.m. to provide Shannon with two more units of PRBCs. Lab results at 7:27 a.m. indicated Shannon had experienced significant blood loss and her blood was not clotting normally. The nurses documented a verbal order from Gunn at 9:00 a.m. to provide Shannon with four units of platelets. Gunn left the hospital at 9:40 a.m. to see patients at her office. The nurses documented another verbal order from Gunn at 10:15 a.m. to provide Shannon with two more units of PRBCs, for a total of six units of PBRCs. However, no verbal order for additional FFP was documented; Shannon received no additional FFP after having received the two units of FFP ordered by Jacobs at 2:18 a.m. Just before 11:00 a.m., Gunn ordered that Shannon be transferred to the ICU. Gunn also ordered Lasix to increase Shannon's low urine output.

At noon, in the ICU, Shannon experienced a large amount of bleeding upon uterine massage. Shannon's uterus was "boggy," or not contracting down. At 12:10 p.m., Shannon's pulse rate was measuring over 200 by EKG. Dr. James Collins, the cardiologist in the ICU, diagnosed Shannon's "extremely fast rate" as paroxysmal atrial tachycardia (PAT). By 12:45 p.m., Shannon's uterus remained boggy, she passed another large amount of blood, and she became agitated. Her oxygen saturation level was at 72%, and her pulse and respiration rate were elevated. Lab results at 1:16 p.m. indicated that her blood still was not clotting normally. Gunn returned to Shannon's bedside at 1:28 p.m. Despite medications to help her uterus contract, Shannon had developed uterine atony, which occurs when the uterus can no longer "clamp down" and leads to heavy bleeding. Gunn arranged for a possible hysterectomy and ordered a "blood emergency."

Shannon entered the operating room just after 2:00 p.m. Upon starting anesthesia, Shannon went into ventricular fibrillation (v-fib), where her heart was unable to pump blood. The anesthesiologists performed CPR for several minutes.

4

Eventually, Gunn performed the hysterectomy. Shannon experienced seizure activity that evening; an EEG showed severely depressed cerebral function, and Shannon's pH level based on her blood gases indicated she was acidotic resulting from a lack of oxygen.

Shannon was transferred to the neurological ICU at St. Luke's Hospital. Shannon underwent months of rehabilitation at The Institute for Rehabilitation and Research (TIRR). Shannon has profound neurocognitive and physical deficits, and since September 14, 2004, has required 24-hour care.

In July 2006, Shannon's husband Andre McCoy, as her permanent guardian, filed suit against Gunn, Jacobs, OGA, Collins, and Woman's. Jacobs and Woman's settled their claims and were dismissed. Collins was nonsuited.

Before trial, McCoy filed a no-evidence motion for summary judgment as to the affirmative defense of comparative responsibility, arguing that there was no evidence the treating labor and delivery nurses were negligent or that any alleged negligence proximately caused Shannon's brain damage. The trial court held a hearing and granted summary judgment.

The jury returned an 11-to-1 verdict in favor of McCoy as to Gunn's negligence and awarded damages of $10,626,368.98. The award included past medical care expenses of $703,985.98 and future medical care expenses of $7,242,403.00. Pursuant to OGA's election of a dollar-for-dollar settlement credit, which Gunn joined, the trial court applied an offset of $1,206,773.50 in its final judgment. The trial court also determined that OGA was vicariously liable for Gunn's negligence and that OGA was entitled to indemnity from Gunn.

Gunn and OGA argue several issues.[2] OGA contends: (1) there is no

---

[2] Gunn adopted OGA's arguments as to OGA's third, fourth, and fifth issues. OGA

evidence of causation; (2) the trial court should not have granted summary judgment as to the hospital's negligence or should have granted Gunn's and OGA's request for continuance; (3) the court should not have excluded Dr. Helen Schilling's testimony regarding Shannon's future medical expenses; (4) the court should have submitted various jury instructions; and (5) the evidence is legally and factually insufficient to support Shannon's past medical expenses.

Gunn contends: (1) the trial court erred by granting no-evidence summary judgment on comparative responsibility; and (2) the evidence is legally insufficient to support the jury's finding that Gunn's negligence harmed Shannon, the award for Shannon's past medical expenses, and $159,854 of the award for her future medical expenses. Gunn further argues OGA's indemnity claim is not ripe.

## II. ANALYSIS

### A. Standards of review

In a legal-sufficiency challenge, we consider whether the evidence at trial would enable a reasonable and fair-minded factfinder to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* We will only reverse the judgment if: (a) there is a complete absence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810. The record contains more than a mere scintilla of evidence if reasonable minds could form differing conclusions about a vital fact's existence.

---

adopted all of Gunn's issues and arguments attacking Gunn's liability to McCoy.

6

*King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). Conversely, the record is insufficient when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

In a factual-sufficiency challenge, we consider and weigh all the evidence, and can set aside a verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761–62 (Tex. 2003). We may not substitute our own judgment for that of the factfinder, even if we would reach a different answer. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). The amount of evidence necessary to affirm the factfinder's judgment is far less than that necessary to reverse its judgment. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

## B. Legally sufficient evidence of proximate cause

We initially address the jury's finding that Gunn's negligence proximately caused the occurrence in question. Both Gunn and OGA contend there is no evidence of a causal link between Gunn's asserted negligence and Shannon's injuries.

Recovery in a medical malpractice case requires proof to a reasonable medical probability that the injuries complained of were proximately caused by the negligence of a defendant. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 860 (Tex. 2009). Proximate cause includes two components: cause-in-fact and foreseeability. *Id.* Proof that negligence was a cause-in-fact of injury requires proof that: (1) the negligence was a substantial factor in causing the

injury, and (2) without the act or omission, the harm would not have occurred. *Id.* The danger of injury is foreseeable if its general character might reasonably have been anticipated. *Doe v. Boys Club*, 907 S.W.2d 472, 478 (Tex. 1995).

The causal connection between the defendant's negligence and the injuries cannot be based upon mere conjecture, speculation, or possibility. *Morrell v. Finke*, 184 S.W.3d 257, 272 (Tex. App.—Fort Worth 2005, pet. denied) (citing *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995)). The issue of causation is usually for the trier of fact in medical malpractice cases. *See id.* Generally, expert testimony based on reasonable medical probability is required to establish proximate cause. *See Jelinek v. Casas*, 328 S.W.3d 526, 533 (Tex. 2010). Such cases often present a battle of the experts, and it is the sole obligation of the factfinder to determine credibility and weigh testimony, particularly opinion evidence. *See Morrell*, 184 S.W.3d at 282.

Under a legal-sufficiency analysis, an expert's opinion may constitute no more than a mere scintilla of evidence if the opinion is not reliable under the same standards that govern admissibility, is speculative or conclusory on its face, or assumes facts contrary to the undisputed facts. *See Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004) (considering legal-sufficiency challenge to expert opinion because the opinion was alleged to be "conclusory or speculative and therefore non-probative on its face"); *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997) (considering legal-sufficiency challenge regarding expert opinion under *Daubert*[3] and *Robinson*[4] reliability standards for rule 702 admissibility); *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499–500 (Tex. 1995) ("When an expert's opinion is based on

---

[3] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–95 (1993).

[4] *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995).

assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment.").

In determining whether expert testimony is reliable, courts may consider the nonexclusive factors set out in *Robinson* regarding scientific theories and techniques, as well as the expert's experience. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009). When the *Robinson* factors do not readily lend themselves to a review of the expert's opinion, expert testimony is unreliable if there is simply too great an "analytical gap" between the foundational data and the opinion proffered. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726–27 (Tex. 1998)).

Examination of the expert's underlying methodology, technique, or foundational data as part of a reliability challenge is "a task for the trial court in its role as gatekeeper, and [is] not an analysis that should be undertaken for the first time on appeal." *Coastal Transp.*, 136 S.W.3d at 233 (explaining prior holding in *Maritime Overseas*, 971 S.W.2d at 412). Therefore, the party must timely make a reliability objection in order to allow the court the opportunity to conduct such analysis and to exercise its gatekeeping function. *Martini v. City of Pearland*, No. 14-11-00111-CV, 2012 WL 1345744, at *4 (Tex. App.—Houston [14th Dist.] Apr. 17, 2012, pet. denied) (mem. op.) (discussing both *Robinson* factors and *Gammill* analytical-gap analysis); *see Coastal Transp.*, 136 S.W.3d at 233. Failure to timely object therefore waives the reliability issue for appellate review. *Martini*, 2012 WL 1345744, at *4.

However, such failure to object does not waive a legal-sufficiency complaint as restricted to the face of the record that the expert's testimony suffers from fatal gaps in analysis or assertions which are simply incorrect, or that the expert's testimony is conclusory or speculative. *See Volkswagen of Am., Inc. v. Ramirez*,

9

159 S.W.3d 897, 912 (Tex. 2004); *Coastal Transp.*, 136 S.W.3d at 229, 233; *Martini*, 2012 WL 1345744, at \*4. "[I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection." *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009). Conclusory or speculative opinion testimony "is not relevant evidence, because it does not tend to make the existence of a material fact more probable or less probable." *Coastal Transp.*, 136 S.W.3d at 232 (internal quotation marks omitted). But just because an expert's testimony could have been clearer does not render it speculative or conclusory as a matter of law. *See Arkoma Basin Exploration Co., Inc. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 389 (Tex. 2008); *Underwriters at Lloyds v. Edmond, Deaton & Stephens Ins. Agency, Inc.*, No. 14-07-00352-CV, 2008 WL 5441225, at \*5 (Tex. App.—Houston [14th Dist.] Dec. 30, 2008, no pet.) (mem. op.).

When evaluating whether an expert's testimony is speculative or conclusory, or whether an expert's opinion contains fatal analytical gaps, we look to the entire record, not just to the expert's statements in isolation. *Morell*, 184 S.W.3d at 279; *United Servs. Auto. Ass'n v. Croft*, 175 S.W.3d 457, 464 (Tex. App.—Dallas 2005, no pet.); *see Ramirez*, 159 S.W.3d at 910.

On appeal, Gunn and OGA do not challenge Brewer's methodology that one unit of blood is equivalent to one point on a hemoglobin test or the foundational data in the lab results. Instead, Gunn and OGA argue that Brewer's testimony is no evidence to support the verdict because her testimony is "speculative and conclusory on its face" and there are fatal gaps between the data and her proffered opinion. Therefore, Gunn and OGA's failure to lodge a reliability objection to this testimony at trial does not preclude our legal-sufficiency review. *See Ramirez*, 159

10

S.W.3d at 911–12; *Coastal Transp.*, 136 S.W.3d at 229, 233; *Martini*, 2012 WL 1345744, at *4.

With these principles in mind, we consider Gunn's and OGA's legal-sufficiency issue.

**1. Brewer's testimony**

**a. Overview**

For the standard of care and deviations alleged against Gunn, McCoy relied upon the testimony of Brewer, a medical doctor board certified in obstetrics and gynecology, and in gynecological oncology. Brewer underwent specific training in handling DIC patients and often serves as a consultant on their treatment. She has taught "how to handle DIC from placental abruption and other causes" to fellows and ob/gyns.

Brewer testified to the following:

- The medical condition known as DIC is a blood clotting disorder that compromises the body's ability to respond to active bleeding. DIC can be triggered by placental abruption.
- With placental abruption, there is a "raw bed" of bleeding in the uterus where the placenta has detached.
- Post fetal demise and prior to delivery, Shannon's abnormal lab values—including decreased hemoglobin, platelet count, and fibrinogen, as well as an increase in prothrombin time—indicated Shannon's blood was not coagulating.
- Shannon "absolutely" had DIC and was actively bleeding while she was under Gunn's care on September 14, 2004.
- Shannon was Gunn's first case of a placental abruption with fetal demise and DIC—so it was unreasonable for her to discharge Kirshon and handle Shannon's case alone.
- FFP is "absolutely critical" to resolving the coagulation problem—plasma helps the body to make the coagulation

11

factors that enable the blood to clot.

- Despite replacing blood, without replacing the clotting factors by administering FFP, a patient will continue to bleed and her DIC cannot be controlled. That is, "[y]ou can po[ur] the blood in, but the blood just keeps coming out if you can't clot it."

- Shannon continued to lose blood volume because she did not receive additional FFP. Shannon "absolutely" needed the FFP.

- The standard of care for a physician treating a patient with DIC requires ordering and administering FFP.

- The standard of care for a physician treating a patient with DIC requires keeping up with the lab results and performing repeated calculations relating to approximate blood loss.

- Managing DIC properly requires infusion of blood products and then checking the appropriate lab result. For example, one infuses FFP and then checks prothrombin time, then decides to infuse additional FFP or "sit for a little while and replace the blood," then gives the PRBCs and checks the hemoglobin.

- Nowhere did the record reveal that Gunn ever calculated Shannon's blood volume loss.

- Three liters of blood is approximately nine units of blood.

- Brewer calculated Shannon's initial "healthy" blood volume, based on her weight and status as a pregnant woman, at approximately 6.7 liters, or 18 units of blood.[5]

- A reasonably prudent physician "need[s] to stay at least equal" with the blood loss in a DIC patient like Shannon. Here, the problem was "all the way along, [Gunn] was behind."

- Calculating a patient's percentage of blood volume loss is even more difficult without "the labs to go by."

- No labs were run or checked between approximately midnight and 7:27 a.m. on September 14.

---

[5] Gunn and OGA assert that the 18-unit figure instead should be 20.1 units based on Brewer's testimony that three liters of blood equals nine units. That is, if three liters equals nine units, then one liter equals three units. Therefore, 6.7 liters multiplied by 3 units equals 20.1 units.

- Shannon's hemoglobin level was 9.5 as reflected in labs collected at approximately 11:00 a.m. during her prenatal visit with Gunn on September 13. As reflected in the 7:27 a.m. lab results on September 14, Shannon's hemoglobin level was down to 5.5. Every one point that the hemoglobin goes down is approximately equal to one net unit of blood. Based on Brewer's calculations, accounting for the two units of blood received at approximately 4:00 a.m. and 5:00 a.m. on September 14, this indicated that Shannon had lost approximately four units of blood up "to the time of delivery" on September 14, or a blood volume loss of about 25%.[6]

- The hemoglobin result of 5.5 should have put Gunn into "panic" mode regarding Shannon's bleeding. This result reflected internal bleeding up until the time of delivery because up to that point "they had not seen bleeding that they could quantitate."

- To a physician applying ordinary care to a patient with DIC, this would indicate there was "serious trouble" because managing DIC requires not getting "behind" on blood loss.

- As reflected in the 7:27 a.m. lab results on September 14, Shannon's prothrombin time had decreased somewhat from 21 to 17-plus seconds, as a result of the FFP given, but remained at a "scary" level where normal ranges from 12 to 13 seconds.[7]

- Gunn did not have a written, coherent plan for how to care for Shannon.

- It probably does not meet the standard of care for a physician treating a patient with DIC to wait until after 9:00 a.m., or at least an hour, to order additional blood products after lab results indicated a 25% blood volume loss.

---

[6] Gunn and OGA dispute this blood volume loss percentage calculation, arguing that 4 units divided by 18 units equals 22%, and using 20.1 units instead, 4 units divided by 20.1 units equals 20%.

[7] Gunn and OGA assert that the 7:27 a.m. prothrombin result was reported by an offsite lab and would not have been available on September 14. If, however, the only prothrombin result available from the hospital lab at 7:27 a.m. on September 14 was 21.5 seconds, then this figure exceeded the 20 seconds in the 12:20 a.m. prothrombin result on September 14 and potentially signaled a greater need for additional FFP.

13

- The standard of care for a physician treating a patient such as Shannon is to remain by the bedside to monitor infusion of blood products.

- The last unit of FFP Shannon received, which was ordered by Jacobs, finished infusing at 3:51 a.m. on September 14.

- Gunn was negligent in failing to order and administer any FFP to Shannon, and there is "no defense" of that failure.

- Shannon continued to lose blood volume because she did not receive any more FFP.

- Shannon needed to have at least three IVs: one for fluids, one for FFP, and one for blood and platelets. "[O]therwise, you can't get these products in fast enough."

- From about the time of delivery until she was moved to the ICU, the labor and delivery nursing notes indicate that Shannon suffered blood loss of about 1.4 liters. Based on Brewer's calculations, accounting for blood received, at about 11:00 a.m., Shannon's blood volume loss was approximately 22%.

- It was foreseeable that when DIC is not controlled and a patient's uterus is unable to contract, there will be additional bleeding.

- Not receiving FFP had "a lot to do with the uterine atony."

- Shannon's urine output decreased while she was still in labor and delivery, a "warning sign" that her kidneys were not being profused with enough blood flow. Gunn ordered Lasix, a diuretic designed to combat fluid overload, but which is contraindicated for bleeding.

- The ICU nursing notes indicate that at 12:00 p.m., Shannon's fundus was boggy and the nurses massaged it resulting in a large amount of external bleeding and clots.

- The ICU nursing notes indicate that at 12:45 p.m., Shannon's fundus was again boggy and the nurses expelled a large amount of blood.

- At about noon, Shannon's heart rate was in the 200s.

- When a patient in Shannon's situation has a heart rate that is

"quite tachycardic," in the 200s, this tells a reasonably prudent physician the heart is attempting to compensate for a lack of blood.

- At about 12:45 p.m., Shannon's oxygen saturation rate was down to 72%, and she was agitated. An oxygen saturation level of 72% is a "crisis." Agitation is a "cardinal sign" that a patient is "going into cardiovascular collapse."

- When a patient in Shannon's situation has an oxygen saturation of 72%, a reasonably prudent physician would already be at her bedside or return immediately, not 40 minutes later.

- If a patient's oxygen level is low, she will increase her respiratory rate to take in more oxygen. In the ICU, Shannon's respiratory rate was elevated above the upper range of normal (over 20).

- After she was moved to ICU, by approximately 1:00 p.m., Shannon suffered an additional 1.6 liters of external blood loss. Based on Brewer's calculations, this represented an additional 11% to 22% blood volume loss, for a total blood volume percentage loss of 33% to 44%.

- As reflected in the 1:16 p.m. lab results on September 14, Shannon's hemoglobin level was 7.5. Even though this reflected an increase in her hemoglobin, Shannon was "continuing to bleed."

- Also, as reflected in the 1:16 p.m. lab results on September 14, Shannon's creatinine level had increased to 1.9 from 1.1 as reflected in the 7:27 a.m. lab results, indicating that her kidneys were not receiving adequate blood flow. "[W]hen we see a change in creatinine this quickly, that is renal failure."

- The body will shunt blood flow away from the kidneys in order to spare damage to the heart and the brain.

- At 1:30 p.m., Shannon's respiratory rate was 30.

- If Shannon had been adequately resuscitated, meaning "corrected to normal," with blood products by approximately 1:00 p.m., then she otherwise would have woken up "intact" from her hysterectomy.

15

- In other words, the "d[i]e was cast with reasonable certainty" at approximately 1:00 p.m.

- It was reasonably foreseeable that when a person suffers significant blood volume loss of about 33% to 44%, "something catastrophic," such as going into v-fib, was going to happen when she was brought to the operating room.

- Shannon's v-fib was likely "inevitable" even without sedation.

- When the heart goes into v-fib, it stops pumping properly, resulting in lack of blood flow and oxygen to the brain.

- Shannon was in v-fib for approximately 11 minutes, and CPR was performed for 20 minutes.

- The pH level of Shannon's blood gases and her EEG indicated that she had suffered global brain damage from oxygen deprivation.

- Shannon's lack of blood and lack of circulating blood volume caused her brain damage because she did not have adequate blood flow and oxygen delivery to her brain.

- If Shannon's DIC had been properly treated, her brain damage would not have occurred.

In contrast to Brewer, defense expert Dr. James Aubuchon, a medical doctor board certified in anatomic and clinical pathology, and blood banking and transfusion medicine, provided the following opinions:

- Shannon's DIC did not cause excessive bleeding.

- There was no need to perform real-time blood loss calculations.

- Brewer's blood-loss calculations "didn't make sense" because they were based on hemoglobin concentrations.

- It would not be necessary to have two IV lines going to provide adequate blood products.

- It would not be appropriate to frequently check a patient's lab results when infusing blood products.

- Providing Lasix would not directly impact circulating blood

16

volume.

- Prothrombin time is a poor predictor of a patient's likelihood of bleeding.

- Shannon's tachycardia did not necessarily result from a lack of low blood volume.

- Shannon's coding in the operating room was not caused by blood loss.

- It was not foreseeable that Shannon would arrest from blood loss.

- The absence of additional FFP infusions between 4:00 a.m. and 1:16 p.m. on September 14 constituted appropriate care.

- Gunn provided appropriate blood transfusion and support, and properly resuscitated Shannon, such that she was hemodynamically stable when her uterine atony occurred.

### b. Causation

McCoy's causation theory is that Gunn failed to adequately treat Shannon's DIC by failing to order FFP to replace Shannon's clotting factors and slow her bleeding, and by failing to infuse enough units of blood. As Shannon continued to bleed, her body attempted various compensation mechanisms in an effort to maintain enough oxygen flow to avoid cardiovascular collapse and damage to her critical organs.[8] However, Shannon continued to lose blood volume. As her blood volume loss approached the critical danger zone of approximately 40%, Shannon's body could no longer compensate, resulting in her cardiac arrest, lack of oxygen flow to her brain, and her permanent brain damage.[9]

---

[8] Aubuchon acknowledged that a 25% blood volume loss in a patient with DIC requires attention. In addition, defense expert Dr. James Alexander, a medical doctor board certified in obstetrics and gynecology, with a subspecialty of maternal-fetal medicine, opined that Shannon needed FFP in the morning after Gunn took over her care.

[9] Aubuchon stated that "40 percent blood loss would have severe consequences for the patient" and that a 33% to 44% blood volume loss is "approaching the point of cardiovascular

17

Gunn and OGA focus their attack on two aspects of Brewer's testimony in arguing that a fatal analytical gap exists in Brewer's theory of causation linking (1) Gunn's asserted failure to address Shannon's bleeding properly between approximately 4:00 a.m. and 1:00 p.m.; and (2) Shannon's cardiac arrest at just after 2:00 p.m. and her subsequent brain damage.

First, they argue that Brewer made an "unsupported guess" when she opined that Shannon lost 1.6 liters of blood—which equates to 4.8 units—between 11:00 a.m. and 1:00 p.m. in the ICU. Brewer estimated this figure from her review of the hospital medical records, particularly the ICU nursing notes; these notes indicate that a "large" but unquantified amount of blood was expelled twice between 11:00 a.m. and 1:00 p.m. when nurses massaged Shannon's uterus.

Second, according to Gunn and OGA, the 1:16 p.m. lab results conclusively disprove Brewer's estimate that Shannon had lost approximately 33% to 44% of her blood volume by about 1:00 p.m.[10] Brewer testified that each point of hemoglobin represents a unit of blood. Therefore, Gunn and OGA argue that the increase in hemoglobin value from 5.5 at 7:27 a.m. to 7.5 at 1:16 p.m. meant Shannon "had 2 more units of blood at 1:16 p.m. than she had at 7:27 a.m." Gunn and OGA rely on these figures to argue that Shannon had lost 14% of her blood volume by 1:16 p.m. rather than the higher volume estimated by Brewer.

It is undisputed on this record that a patient faces an increasing likelihood of

collapse."

[10] Although Gunn acknowledged that part of her job as a physician managing a DIC patient was to perform calculations to monitor blood volume loss, she testified there were no calculations in the medical chart and could not give any opinions as to calculations of Shannon's blood volume loss.

Aubuchon acknowledged that he sometimes performs after-the-fact blood volume loss calculations to determine whether a patient was still bleeding or was destroying transfused red blood cells, but also did not perform any blood volume loss calculations in this case.

18

cardiac arrest as blood volume loss approaches 40%. Therefore, the asserted fatal analytical gap is not a valid basis for attacking causation if the jury reasonably could have concluded from unchallenged evidence that Shannon's blood volume loss between approximately 4:00 a.m. when Gunn took over Shannon's care and 1:00 p.m. approached 40%.

*Blood loss before 6:20 a.m. delivery.* Gunn and OGA do not dispute that Shannon experienced DIC while she was under Gunn's care and that Shannon experienced internal bleeding prior to delivery. Brewer explained that when a DIC patient like Shannon has not exhibited external bleeding that can be quantified, laboratory results are useful to determine whether the patient is experiencing internal blood loss. Gunn and OGA also do not challenge: (1) Brewer's methodology equating a one-point drop in hemoglobin to one net unit of blood loss; (2) lab results showing a drop in hemoglobin from 9.5 as reflected in the lab results from Shannon's September 13 prenatal appointment to 5.5 as reflected in the 7:27 a.m. lab results on September 14; or (3) aside from noting it should be 20 percent instead of 25 percent,[11] Brewer's initial percentage blood volume loss calculation based on these hemoglobin figures reflecting Shannon's internal bleeding up "to the time of delivery."

Applying this methodology, Shannon's net blood volume loss was four units between approximately 11:00 a.m. on September 13 when Shannon's blood was drawn during her prenatal visit and the 6:20 a.m. delivery on September 14; Shannon experienced internal bleeding totaling about six units of blood and two units of blood were replaced during this interval. Based on this four-unit figure, and using Gunn's and OGA's higher 20.1-unit estimate for Shannon's initial blood volume, Shannon's percentage of blood volume loss stood at approximately 20%

---

[11] *See* n.6.

19

when delivery began.

***Blood loss during delivery and before 11:00 a.m.*** Even a normal delivery results in external blood loss.[12] Here, because Shannon was suffering from DIC, Kirshon recommended watching for "major postpartum hemorrhage." According to undisputed figures in the labor and delivery medical records, Shannon experienced external bleeding of approximately 1.4 liters of blood from the time of delivery until 11:00 a.m. Gunn and OGA do not challenge that one liter of blood equals three units. Therefore, the jury reasonably could have concluded that Shannon lost an additional 4.2 units of blood during delivery and before 11:00 a.m.

***Blood loss after 11:00 a.m.*** Gunn and OGA do not dispute that Shannon experienced bleeding after she was moved to the ICU at approximately 11:00 a.m. They dispute the amount and contend that Brewer's 1.6-liter/4.8-unit figure for the 11:00 a.m.-to-1:00 p.m. interval is speculative.

On their face, the medical records do not list a specific figure for the approximate blood loss experienced by Shannon in the ICU between 11:00 a.m. and 1:00 p.m. Gunn acknowledged, and Gunn and OGA do not otherwise challenge, that Shannon experienced two instances of "large" blood loss when the ICU nurses massaged her uterus at 12:00 p.m. and 12:45 p.m. The labor and delivery nursing notes reflect that a prior fundal massage at approximately 9:00 a.m. yielded "moderate" bleeding estimated at 1.5 units.[13] Gunn and OGA do not challenge this figure.

---

[12] Brewer testified that a normal amount of blood loss from a vaginal delivery was 700 cc. 1000 cc equals one liter; one liter equals three units of blood. 700 cc or 0.7 liters equals 2.1 units. Gunn's post-operative report estimated Shannon's delivery blood loss at 700 to 1000 cc. 700 to 1000 cc or 0.7 to 1 liter equals 2.1 to 3 units.

[13] The estimated blood loss figure at 9:00 a.m. in Shannon's output record was 500 cc, which the nursing notes described as "mod. bleeding." 500 cc or 0.5 liters equals 1.5 units.

20

We assume without deciding that Brewer's 1.6-liter/4.8-unit estimate of blood loss in the ICU between 11:00 a.m. and 1:00 p.m. is speculative. Even with this assumption, the jury reasonably could have relied on the quantified "moderate" blood loss figure of 1.5 units from an earlier bleeding episode following uterine massage to conclude that Shannon lost at least three units when she experienced two episodes of "large" blood loss from uterine massage between 11:00 a.m. and 1:00 p.m.

There is no dispute that Shannon continued to expel blood after 1:00 p.m. According to Gunn's discharge summary, Gunn approximated active bleeding at Shannon's perineum to be 800 to 1000 cc at 1:28 p.m., when Gunn returned to Shannon's bedside. 800 to 1000 cc or 0.8 to 1 liters equals 2.4 to 3 units.

***Total blood loss by 1:00 p.m.*** In sum, this record allowed the jury reasonably to conclude that Shannon lost six units of blood between approximately 11:00 a.m. on September 13 and 6:20 a.m. on September 14 due to internal bleeding, and that she lost another 4.2 units of blood between 6:20 a.m. and 11:00 a.m. due to external bleeding. Even if Brewer's estimate of a 4.8-unit blood loss between 11:00 a.m. and 1:00 p.m. is given no weight, as discussed above, the jury could have relied on other unchallenged evidence in the record reasonably to conclude that Shannon's external blood loss in the ICU between 11:00 a.m. and 1:00 p.m. totaled at least three units. Adding these figures together would allow a reasonable jury to conclude that Shannon's total blood loss by 1:00 p.m. was at least 13.2 units.

Gunn and OGA do not dispute that Shannon received six units of blood via transfusion between approximately 4:00 a.m. and 1:00 p.m.

Utilizing the initial blood volume figure of 20.1 units cited by Gunn and OGA, the jury reasonably could have concluded that Shannon's blood volume loss

reached approximately 36% by 1:00 p.m. in reliance on these figures:

- 20.1 units of blood present in Shannon's body at 11:00 a.m. on September 13 minus 13.2 units of blood lost plus 6 units of blood replaced equals 12.9 units of blood present at 1:00 p.m. on September 14.

- 20.1 units of blood present in Shannon's body at 11:00 a.m. on September 13 minus 12.9 units of blood present at 1:00 p.m. on September 14 equals a net blood loss of 7.2 units during that interval.

- A net blood loss of 7.2 units as of 1:00 p.m. on September 14 divided by 20.1 units of blood present at 11:00 a.m. on September 13 equals 36% of blood volume loss during that interval.

This percentage falls squarely within Brewer's estimated blood volume loss range of 33% to 44%, and approaches the critical danger zone where it is undisputed on this record that cardiac arrest is a reasonable medical probability. The jury also could have considered evidence of additional blood loss after 1:00 p.m.

Contrary to Gunn's and OGA's position, Shannon's hemoglobin result of 7.5 as reflected in her 1:16 p.m. lab results does not conclusively establish that Shannon's blood volume percentage was increasing or that her blood volume loss was 14% at 1:00 p.m. Viewed in isolation, a lab result indicating that Shannon's hemoglobin had gone up by two points could indicate an increase in blood volume. But this evidence cannot be viewed in isolation. In assessing proximate cause, the jury was entitled to credit Brewer's testimony that it is not "appropriate" for someone managing a DIC case to consider just one lab result such as hemoglobin[14] and ignore all the other markers, including the presence of quantifiable external bleeding.

---

[14] Aubuchon testified that one "really can't calculate or project what the blood loss is just by looking at hemoglobin."

The legal-sufficiency standard of review requires this court to consider all evidence and inferences in the light most favorable to the jury's findings, and to disregard all contrary evidence and inferences if a reasonable juror could do so when assessing proximate cause. Applying this standard in light of the evidence discussed above, this jury reasonably could have concluded that Shannon's blood volume loss crossed the threshold of cardiovascular crisis by 1:00 p.m. and thereafter. In addition, the jury reasonably could have relied upon evidence that despite the elevation in hemoglobin level at 1:16 p.m. Shannon was continuing to bleed; her creatinine levels had "almost doubled" from 1.1 at 7:27 a.m. to 1.9 at 1:16 p.m., which indicated reduced blood flow to the point of renal shutdown;[15] she was "quite tachycardic"; her oxygen saturation had dropped to a "crisis" level; and she was exhibiting agitation signaling imminent cardiovascular collapse.

The remainder of Gunn's and OGA's legal-sufficiency issue attacks Brewer's opinions as being conclusory. Gunn and OGA rely on *Jelinek* and *Blan v. Ali*, 7 S.W.3d 741 (Tex. App.—Houston [14th Dist.] 1999, no pet.), in making this argument.

In *Jelinek*, the Supreme Court of Texas concluded that an expert must explain to a reasonable degree of medical probability "how and why" the negligence caused the injury. 328 S.W.3d at 536–38 (reversing judgment based on jury verdict because expert causation testimony was conclusory; expert testified that patient's pain was probably caused by lack of antibiotics but acknowledged pain could have been caused by other factors antibiotics would not have treated).

---

[15] According to Brewer:

Q. So if we have over here where a 25-percent blood loss results in a creatinine of 1.1, what would you expect the creatinine to do over here at 1:00 o'clock when we have 33 or 44 percent of blood loss, would it have gotten worse?

A. That's what it did, absolutely.

In *Blan*, this court concluded that an expert must explain the basis of his statement to link his conclusions to the facts. 7 S.W.3d at 748 (affirming summary judgment where conclusory expert affidavit stated that doctors' negligence allowed patient to deteriorate and that prompt recognition of patient's condition would have led to appropriate treatment and, more than likely, an improved outcome).

This reliance is misplaced because the record here distinguishes this case from the circumstances addressed in *Jelinek* and *Bran*. Brewer explained the importance of replacing Shannon's clotting factors particularly through infusions of FFP. Brewer also explained the importance of adequately replacing Shannon's blood volume loss. She faulted Gunn for failing to take these steps. Brewer sufficiently detailed "how and why" these two primary failures of DIC management in Shannon's treatment led to her percentage of blood volume loss crossing into a critical danger zone undisputedly linked to cardiac arrest. Brewer further opined that cardiac arrest led to Shannon's brain damage due to lack of oxygen. Brewer's testimony was grounded on Shannon's medical records and lab results. *See Jelinek*, 328 S.W.3d at 536–37. Moreover, unlike the expert in *Jelinek*, Brewer did not undermine her own conclusions because she expressed "no doubt" that Gunn's failure to properly treat Shannon's DIC caused her brain damage. *Cf. id.* at 536–37 (expert conceded patient's symptoms were consistent with infections not treatable with the allegedly negligently omitted antibiotics). Brewer explained how and why Shannon's clotting factors were not replaced and her blood volume continued to decrease to a crisis level as a result of Gunn's negligent actions. Brewer also explained how and why adequate replacement of Shannon's lost blood volume would have spared her brain functioning. *Cf. Bran*, 7 S.W.3d at 748.

Gunn and OGA further argue that Brewer's testimony amounts to no

24

evidence because she did not rule out other causes of Shannon's brain injuries. The Texas Supreme Court has noted that a medical causation expert need not disprove or discredit every other possible cause. *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 218 (Tex. 2010); *see Bradley v. Rogers*, 879 S.W.2d 947, 954 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (plaintiff need not establish causation in terms of medical certainty nor exclude every other reasonable hypothesis). If that were the case, then few expert opinions would survive scrutiny for purposes of legal sufficiency. *See Crump*, 330 S.W.3d at 218. However, when an expert fails to explain or adequately disprove alternative theories of causation, this renders her own theory speculative and conclusory. *Wal-Mart Stores, Inc. v. Merrell*, 313 S.W.3d 837, 840 (Tex. 2010) (per curiam).

Brewer recognized that uterine atony can occur in the absence of DIC, but she explained Shannon's uterine atony was aggravated by her hemodynamic instability verging on crisis.[16] Nor did Brewer believe Shannon's uterine atony caused her brain injuries. Brewer also explained how, based on her review, Shannon's EEG was consistent with global anoxic brain damage because it lacked the focal features that would be consistent with a stroke or brain hemorrhage. In addition, Brewer explained why she believed any microthrombi theory involving the formation of small clots in Shannon's brain was highly unlikely.[17] Brewer similarly explained why she would rule out pulmonary[18] or amniotic fluid[19]

---

[16] Alexander did not believe that DIC caused Shannon's uterine atony. Aubuchon also did not believe any hematologic situation caused Shannon's uterine atony. However, Alexander and Aubuchon both acknowledged that a patient who is hemodynamically unstable can develop uterine atony.

[17] Brewer based this on Shannon's lack of clotting and her review of Shannon's EEG. Brewer discounted the microthrombi study relied on by defense expert neurologist Dr. Martin Steiner because it involved a patient population dissimilar to Shannon. Brewer also noted how none of Shannon's 17 neurological consults attributed her brain injuries to microthrombi.

[18] Brewer explained that pulmonary embolus typically occurs when a patient is

25

embolus, as well as sepsis.[20]  Finally, Gunn and OGA point to Collins's testimony that he diagnosed Shannon's rapid heartbeat as a result of an atrial conduction disorder, not low blood volume, and he did not believe Shannon was in hemorrhagic shock prior to 1:00 p.m.  But opining that Shannon's PAT was caused by a conduction disorder is not the same as opining that Shannon's brain injuries were caused by PAT[21] or any conduction disorder.[22]  Even assuming this were an alternative causation theory, Brewer explained that Shannon's PAT could not be considered "out of context"; Collins came in on an emergency basis without the background on Shannon; and Shannon's having an arrhythmia unrelated to her blood loss was "unlikely . . . because the underlying issue is her blood loss."

Like many medical malpractice cases, this case was in many respects a "battle of the experts." *See Morrell*, 184 S.W.3d at 282.  It is the factfinder's—not this court's—province to decide which expert witness to credit. *See id.*  The jury heard conflicting opinions; it reasonably could have believed Brewer in light of unchallenged evidence discussed above. *See id.*  In sum, considering only the evidence and reasonable inferences favorable to the jury's proximate cause finding, and disregarding all evidence and inferences to the contrary because a reasonable juror could do so, we conclude that the evidence is legally sufficient to support a finding of proximate cause.[23]  Therefore, we overrule Gunn's second issue and

hypercoagulable (clotting too much).  Also, Shannon's high oxygen content 30 minutes after the cardiac event was not indicative of pulmonary embolus.

[19] Brewer explained that amniotic fluid embolus usually occurs within 30 minutes of delivery, not hours later.

[20] Brewer discounted sepsis because Shannon's cultures "never grew anything."

[21] Collins also acknowledged PAT can be caused by many different things.

[22] We note a subpart of Gunn and OGA's legal-insufficiency argument is that Collins admitted to not being qualified to opine as to what caused Shannon's brain injuries.

[23] Because the jury properly could have determined proximate cause based on Brewer's testimony, we need not reach Gunn's and OGA's subissue that Collins's causation opinions

OGA's first issue.

## C. McCoy's no-evidence motion for summary judgment

In their first and second issues, respectively, Gunn and OGA argue that the trial court erred in granting no-evidence summary judgment as to their affirmative defense of comparative responsibility directed towards Woman's based on the conduct of its nursing staff.

To obtain a jury submission on comparative responsibility, Gunn and OGA needed to proffer evidence addressing: (1) a duty requiring the treating labor and delivery nurses to conform to a certain standard of care; (2) the applicable standard of care and its breach; (3) resulting injury; and (4) a reasonably close causal connection between the nurses' breach of the standard of care and the injury. *See Blan*, 7 S.W.3d at 744. Gunn and OGA contend there is an evidentiary basis for a comparative responsibility submission to a factfinder against Woman's because Gunn issued a verbal order for FFP to be administered to Shannon that was not documented or implemented by the nurses.

A no-evidence motion for summary judgment is essentially a motion for a pretrial directed verdict. Tex. R. Civ. P. 166a(i); *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The same no-evidence legal-sufficiency standard of review applies. *King Ranch*, 118 S.W.3d at 751. After an adequate time for discovery, a party without the burden of proof may, without presenting evidence, seek summary judgment on the ground that there is no evidence to support one or more essential elements of the nonmovant's claim or defense. Tex. R. Civ. P.

---

amounted to no evidence of causation. *See* Tex. R. App. P. 47.1. And even if the trial court erred by admitting Collins's allegedly "strikingly similar" testimony during rebuttal, any error in admitting testimony cumulative of Brewer's properly admitted testimony was harmless. *See id.* 44.1(a)(1); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989); *Haryanto v. Saeed*, 860 S.W.2d 913, 924 (Tex. App.—Houston [14th Dist.] 1993, writ denied).

166a(i). The nonmovant is required to present evidence raising a genuine issue of material fact supporting each element contested in the motion. *Id.*; *Timpte Indus.*, 286 S.W.3d at 310.

We review the trial court's grant of summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). In most medical malpractice cases, "expert testimony is necessary" to establish or preclude summary judgment. *Blan*, 7 S.W.3d at 744; *see Am. Transitional Care Centers of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001). We review the evidence in the light most favorable to the nonmovant, disregarding all contrary evidence and inferences. *Timpte*, 286 S.W.3d at 310. Where, as here, a trial court's order granting summary judgment does not specify the ground or grounds relied on for its ruling, we affirm the summary judgment if any theory advanced is meritorious. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989).

A party may not avoid a no-evidence summary judgment by presenting speculative or conclusory opinions not adequately supported by facts. *See Hodgkins v. Bryan*, 99 S.W.3d 669, 674–75 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (affirming granting of no-evidence summary judgment as to causation where expert's affidavit was conclusory—it did not include facts or studies to support that decedent would have survived her brain cancer with prompt treatment). An expert opinion is conclusory if it is essentially a "conclusion without any explanation." *Arkoma Basin Exploration*, 249 S.W.3d at 389 & n.32. Again, evidence does not exceed a scintilla if it is so weak as to do no more than to create a mere surmise or suspicion that the fact exists. *Ridgway*, 135 S.W.3d at 601; *Hodgkins*, 99 S.W.3d at 673.

Here, McCoy filed a motion for no-evidence summary judgment as to the

affirmative defense of comparative responsibility.[24]   With regard to negligence, McCoy argued no expert testimony established that any of the treating labor and delivery nurses failed to exercise ordinary care with respect to the care and treatment of Shannon on September 14, 2004; no evidence demonstrated that anything the treating nurses allegedly did or did not do in the care and treatment of Shannon proximately caused her brain injury; and no evidence demonstrated that any conduct by the treating nurses was a substantial factor in bringing about Shannon's brain injury.  As the parties seeking a jury submission on the asserted negligence of the treating labor and delivery nurses, Gunn and OGA had the burden to introduce sufficient evidence to survive summary judgment.  *See* Tex. R. Civ. P. 166a(i); *accord* Tex. Civ. Prac. & Rem. Code Ann. § 33.003(b) (West 2013) (only permitting jury submission on percentage responsibility with sufficient evidence in support).

Gunn and OGA responded, arguing that excerpts from Aubuchon's and Brewer's depositions provided more than a scintilla of evidence to apportion fault against Woman's, by and through the actions of its nurses, in not properly documenting and implementing Gunn's alleged verbal order to administer more FFP to Shannon.  McCoy replied that there was no evidence Aubuchon satisfied the qualification requirements under chapter 74 to be able to testify about the appropriate nursing standard of care or how the treating nurses allegedly violated the standard of care.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b) (West 2013); *cf. Hood v. Phillips*, 554 S.W.2d 160, 165–66 (Tex. 1977) (plaintiff must establish that medical professional defendant has undertaken mode or form of

---

[24] This motion also addressed the alleged comparative negligence of Andre McCoy, his family members, and Collins.  However, in their response, Gunn and OGA indicated they were not seeking to apportion fault against McCoy, his family members, and Collins, but rather only against the treating labor and delivery nurses at Woman's.

29

treatment which reasonable and prudent member of medical profession would not have undertaken under same or similar circumstances, usually by expert testimony).

## 1. Negligence

Here, Gunn and OGA needed to put forth more than a scintilla of evidence that the treating labor and delivery nurses committed a breach of the applicable standard of care which was a proximate cause of the injury. The record does not contain evidence of any documented physician's order, whether issued in writing or verbally, by Gunn or any other physician treating Shannon, to provide Shannon with any additional FFP beyond the two units she received between approximately 3:00 a.m. and 4:00 a.m. on September 14 while under the care of Jacobs before Gunn arrived at the hospital. Therefore, to raise a fact issue on the theory of comparative responsibility advocated on appeal by Gunn and OGA, there would need to be evidence that the treating labor and delivery nurses failed to document and implement a verbal order issued after 4:00 a.m. by Gunn or another physician treating Shannon that she receive more FFP. In the summary judgment proceedings, Gunn and OGA did not provide testimony or affidavits from Gunn, another treating physician, or any treating nurse that Gunn or another treating physician issued a verbal order for FFP to a treating nurse during the interval between 4:00 a.m. and 1:00 p.m. on September 14.

Gunn and OGA point to testimony from Aubuchon and Brewer to support a comparative responsibility submission based on the nurses' conduct. With regard to the nursing standard of care, Aubuchon stated that he would "certainly not be offering any opinions regarding [anyone on the clinical team's] clinical care" except with regard to his "area of transfusion medicine expertise, that is, whether or not the blood component volumes administered were adequate." Nor do the

30

deposition excerpts relied on by Gunn and OGA demonstrate that Aubuchon (a pathologist and blood banking and transfusion medicine physician) was qualified to address the standard of care applicable to the treating labor and delivery nurses. *See Baylor Med. Ctr. at Waxahachie, Baylor Health Care Sys. v. Wallace*, 278 S.W.3d 552, 558 (Tex. App.—Dallas 2009, no pet.) ("Section 74.402(b) makes it clear that different standards of care apply to physicians and health care providers.").

Even if he were qualified to opine on the nursing standard of care, and any attendant breach, Aubuchon's stated "disappointment" in the nurses' "deficiencies" in documenting blood components administered and verbal orders by physicians was not supported by sufficient facts or explanations.[25] Further, Aubuchon's belief that "at least two units of plasma that were ordered early in the morning of September 14th were not ultimately transfused in the timeframe that was expected by the ordering physician" amounts to mere surmise or suspicion because it is speculative and conclusory. Aubuchon did not remember, did not know, and declined to guess at the identity of any physician who supposedly ordered such plasma. He could not recall what time the plasma allegedly was ordered. He acknowledged paying little attention to "who ordered what blood component when" and lacked the details to assign responsibility for "who didn't transmit an order or didn't hang the units in question." When pressed to provide "any evidence that any fresh frozen plasma that was ordered by any physician was not administered by the nurses," Aubuchon could not do so because he did not "have

---

[25] *See Chopra v. Hawryluk*, 892 S.W.2d 229, 233 (Tex. App.—El Paso 1995, writ denied) (summary judgment evidence only stating radiologist should examine x-ray and report results in written report but not providing steps necessary to properly read particular x-ray at issue or stating what adequate report should contain was insufficient); *Armbruster v. Mem'l Sw. Hosp.*, 857 S.W.2d 938, 942–43 (Tex. App.—Houston [1st Dist.] 1993, no writ) (summary judgment evidence merely concluding lack of negligence without offering facts or explanations was insufficient).

31

any notes" on the medical records or "any stickies on the depositions."

With regard to Brewer, we assume for argument's sake that she was sufficiently familiar with the standard of care for labor and delivery nurses treating a patient such as Shannon to opine on this point.[26] Even with this assumption, the testimony cited in Gunn's and OGA's summary judgment response does not raise a fact issue.

In that testimony, Brewer stated that "the person who ordered it, and the person who didn't carry out the order are all responsible." This testimony was provided "[i]n general, not in this particular case." This "general" testimony— which does not indicate what "it" was that was ordered aside from "blood or blood products"—has not been shown to have any applicability in this case because Brewer repeatedly said she saw no documentation in Shannon's medical records indicating that a doctor ordered any blood or blood products for a DIC patient where a treating nurse failed to carry out such order.[27] Brewer agreed that "it's a problem for the nurse" and "it's a problem for the physician" if four units of FFP were ordered but were not administered by the nurses; Brewer does not provide any evidence that Gunn or another physician treating Shannon issued a verbal

---

[26] We reject the effort of Gunn and OGA to rely on Brewer's original healthcare liability expert report attached to McCoy's original petition, which cited to the Standards of Nursing Practice. Different, more formal requirements apply to evidence offered in connection with summary judgment or at trial. *See Palacios*, 46 S.W.3d at 879. Chapter 74 does not permit the use of healthcare liability expert reports as evidence or during trial or other proceedings. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(k) (West 2013). Furthermore, nothing within the deposition excerpts relied on by Gunn and OGA in response to McCoy's no-evidence motion for summary judgment addresses Brewer's familiarity with the treating nurses' standard of care.

[27] Although Gunn and OGA in their response stated that they were relying on "the medical records in this case in support of [their] affirmative defense," they did not provide the trial court with any citations to or descriptions of those records. At the summary judgment hearing, Gunn's counsel indicated she was withdrawing the medical records as summary judgment evidence. While Gunn and OGA cite to portions of the medical records on appeal, specifically, Gunn's progress notes, they cite to a trial exhibit that was not part of the summary judgment record.

32

order for additional FFP to be administered between 4:00 a.m. and 1:00 p.m. Nor does Brewer provide evidence that a treating nurse failed to document and implement such a verbal order for additional FFP to be administered during this interval. Brewer later stated that upon re-review of the medical records, she concluded that Gunn never ordered that Shannon receive four units of FFP. Brewer therefore corrected her deposition testimony: "I think it's a problem for Dr. Gunn, not the nurse." Nor did Brewer or Aubuchon testify that the nurses' standard of care included anything beyond following the doctors' orders regarding administering blood products.[28]

Based on our review of the summary judgment record, even taking all the evidence and making inferences in their favor, Gunn and OGA did not meet their burden to raise a fact issue regarding the nurses' negligence. Therefore, the trial court did not err by granting no-evidence summary judgment in favor of McCoy as to the affirmative defense of comparative responsibility.

---

[28] On appeal, with regard to negligence, Gunn and OGA also point to excerpts from Alexander's deposition. In their response below, they did not provide the trial court with any citations to or descriptions of Alexander's testimony. *See Moon Sun Kang v. Derrick*, No. 14-13-00086-CV, 2014 WL 2048424, at *7 (Tex. App.—Houston [14th Dist.] May 15, 2014, pet. denied) (mem. op.) ("In determining whether the nonmovant raised more than a scintilla of evidence in support of his claims and affirmative defenses, we are limited to the summary judgment proof produced in the response." (internal quotation marks omitted)).

In any event, Gunn and OGA cannot rely on Alexander's testimony to raise a fact issue on whether Gunn ordered the additional FFP noted in her progress notes. Alexander's testimony on this point amounts to mere surmise or suspicion because it is speculative and conclusory. Alexander discussed Gunn's "plan" in her progress notes to give "FFP x 4" to Shannon, but stated that a physician's plan is not an order. From the time Gunn took over Shannon's care at 4:00 a.m. until her cardiac arrest at 2:00 p.m., Alexander testified he "did not see a written or verbal order to give fresh frozen plasma." Alexander pointed to two blood bank unit issue cards reflecting two units of FFP issued at 2:21 p.m. on the afternoon of September 14—after Shannon had already suffered cardiac arrest—as "evidence that the blood bank received an order and prepared the plasma." However, Alexander did not know who gave the orders for the preparation and issuance of those two units of fresh frozen plasma or when such orders were given.

## 2. Causation

Even if Gunn and OGA raised a fact issue as to the treating labor and delivery nurses' negligence, the trial court properly could have granted McCoy's no-evidence summary judgment as to proximate cause. Gunn and OGA attempt to rely on McCoy's live petition. However, setting aside whether we appropriately could consider statements in McCoy's pleading as judicial admissions in this healthcare liability case, assertions such as "each of the [alleged acts of negligence] was a proximate and producing cause of Plaintiffs' injuries and damages" are conclusory statements not sufficient to support or defeat summary judgment. *See Hodgkins*, 99 S.W.3d at 674–75; *Blan*, 7 S.W.3d at 748; *see also Madeksho v. Abraham, Watkins, Nichols & Friend*, 57 S.W.3d 448, 455 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (conclusory opinions in pleadings do not constitute summary judgment evidence). Moreover, the statements in McCoy's petition do not support a causal nexus between the allegedly responsible party's conduct and the event sued upon. *See Jelinek*, 328 S.W.3d at 532. Instead, they are specifically directed at Gunn's—not the treating labor and delivery nurses'—alleged negligence.

Gunn and OGA next point to this portion of Brewer's testimony:

Q. It would have been important, would it not, for Mrs. McCoy to have had the four units of FFP that Dr. Gunn ordered at 7:20 a.m.?
A. Yeah. . . .

They argue that Brewer did not need to use the "magic words" proximate cause. However, again, this testimony is not sufficiently linked to any act or omission by any treating nurse as a responsible party. In addition, Brewer's statement amounts to a mere conclusion that any negligence, even if committed by the treating nurses, in not administering such ordered blood product proximately caused Shannon's

34

brain injuries. Gunn and OGA do not point to any evidence in Brewer's deposition or elsewhere in the summary judgment-related evidence explaining how or why it was important based on a reasonable medical probability for Shannon to have received any ordered blood product. *See Hodgkins*, 99 S.W.3d at 674–75 (no evidence raised fact issue on "causal connection between the negligent act and the injury based on reasonable medical probability"); *Blan*, 7 S.W.3d at 748 (same); *see also Jelinek*, 328 S.W.3d at 536 (expert must explain how and why negligence caused injury).

With regard to Aubuchon, he expressly refused to provide an opinion regarding "whether the nursing conduct was the proximate cause of any harm to Shannon" and did not know whether any nursing conduct "would have changed the outcome in the case."[29]

Based on our review of the summary judgment record, even taking all the evidence and making inferences in their favor, Gunn and OGA did not meet their burden to raise a fact issue connecting the treating labor and delivery nurses' negligent conduct with Shannon's brain injury to a reasonable medical probability. Therefore, the trial court did not err by granting no-evidence summary judgment in favor of McCoy as to the affirmative defense of comparative responsibility.

### 3. Refusal of continuance

Finally, Gunn and OGA challenge the trial court's refusal to grant a continuance on McCoy's motion for no-evidence summary judgment, arguing that it was "patently unfair" to allow McCoy to preclude comparative responsibility on

---

[29] Gunn and OGA do not point to any causation evidence in Alexander's testimony. Alexander in fact acknowledged that he was not going to testify that any nurse did anything negligent in this case that caused any harm to Shannon. He also did not plan to testify as to what caused Shannon's brain injury.

summary judgment and then proceed to trial and present the same challenged facts through Brewer.

Factors to consider when deciding whether a trial court clearly abused its discretion in denying continuance of a summary judgment hearing include: the length of time the case has been on file, the materiality and purpose of the discovery sought, and whether the party seeking the continuance exercised due diligence to obtain the requested discovery. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004). Here, the litigation had been pending over five years when McCoy filed his no-evidence summary judgment motion, and Gunn and OGA had twice deposed Brewer. Moreover, Gunn and OGA failed to adequately explain their failure to obtain the testimony sought and did not show that the testimony could not be procured from another source. *See Duerr v. Brown*, 262 S.W.3d 63, 78–79 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Finally, Gunn and OGA point to no statute or other authority preventing McCoy from moving for no-evidence summary judgment as to comparative responsibility and then proceeding to trial as they did here. Under such circumstances, it was Gunn's and OGA's burden, not McCoy's, to bring forth more than a scintilla of evidence to withstand no-evidence summary judgment on the comparative responsibility of the treating nurses. We overrule Gunn's first issue and OGA's second issue.

## D. Legally sufficient evidence of $703,985.98 award for Shannon's past medical expenses

As their third and fifth issues, respectively, Gunn and OGA argue that McCoy failed to put forth legally sufficient evidence of Shannon's past medical expenses, for which the jury awarded $703,985.98. Gunn and OGA argue because McCoy did not offer expert testimony or affidavits in compliance with section 18.001 of the Texas Civil Practice and Remedies Code, there is no evidence that

36

Shannon's past medical expenses were reasonable and necessary. They further argue that McCoy presented no evidence of a causal link between Shannon's expenses and Gunn's actions. Finally, Gunn and OGA challenge the lack of segregation within the past expenses.

### 1. Applicable law

The amount of damages to which a plaintiff is entitled is generally a fact question. *Garza de Escabedo v. Haygood*, 283 S.W.3d 3, 6 (Tex. App.—Tyler 2009), *aff'd*, *Haygood v. De Escabedo*, 356 S.W.3d 390 (Tex. 2011). A claim for past medical expenses must be supported by evidence that such expenses were reasonable and necessary. *Whitaker v. Rose*, 218 S.W.3d 216, 223 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Further, the plaintiff must produce evidence from which the jury may reasonably infer that the claimed damages resulted from the defendant's conduct. *Haygood*, 356 S.W.3d at 399; *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 838 (Tex. 1997).

A plaintiff may prove that medical expenses were reasonable and necessary either by presenting expert testimony, or by submitting affidavits compliant with section 18.001. *Whitaker*, 218 S.W.3d at 223; *see* Tex. Civ. Prac. & Rem. Code Ann. § 18.001 (West 2013). An affidavit filed in compliance with section 18.001 is an exception to the hearsay rule. *D & M Marine, Inc. v. Turner*, 409 S.W.3d 693, 699 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (citing *Hong v. Bennett*, 209 S.W.3d 795, 801 (Tex. App.—Fort Worth 2006, no pet.)); *see Good v. Baker*, 339 S.W.3d 260, 271–72 (Tex. App.—Texarkana 2011, pet. denied). Section 18.001 is "purely procedural, providing for the use of affidavits to streamline proof of the reasonableness and necessity of medical expenses." *Haygood*, 356 S.W.3d at 397.

Section 18.001(b), as in effect at the relevant time, provided:

Unless a controverting affidavit is filed as provided by this section, an affidavit that the amount a person charged for a service was reasonable at the time and place that the service was provided and that the service was necessary is sufficient evidence to support a finding of fact by judge or jury that the amount charged was reasonable or that the service was necessary.

Act of April 16, 1985, 69th Leg., R.S., ch. 959, 1985 Tex. Gen. Laws 3264 (amended 2013) (current version at Tex. Civ. Prac. & Rem. Code § 18.001). The affidavit must:

(1) be taken before an officer with authority to administer oaths;
(2) be made by:
    (A) the person who provided the service; or
    (B) the person in charge of records showing the service provided and charge made; and
(3) include an itemized statement of the service and charge.

Tex. Civ. Prac. & Rem. Code Ann. § 18.001(c) (West 2013); *see also* Act of May 22, 1993, 73rd Leg., R.S., ch. 248, 1993 Tex. Gen. Laws 549–51 (amended 2013) (current version at Tex. Civ. Prac. & Rem. Code § 18.002) (providing sample affidavit forms). An affidavit that substantially complies with section 18.001 is sufficient. Tex. Civ. Prac. & Rem. Code Ann. § 18.002(c) (West 2013).

Section 18.001(d), as of the relevant time, provided that such affidavits must be filed with the clerk and served on all other parties at least 30 days before trial evidence is first presented. Act of 1987, 70th Leg., R.S., ch. 167, 1987 Tex. Gen. Laws 1350 (amended 2013) (current version at Tex. Civ. Prac. & Rem. Code § 18.001). Procedures exist to challenge the reasonableness of the amount charged and to challenge whether the treatments provided were necessary. *In re Siroosian*, 449 S.W.3d 920, 926 (Tex. App.—Fort Worth 2014, orig. proceeding) (citing section 18.001(e)). Section 18.001 provides "for any dispute over reasonable and

38

necessary expenses to be teed up by affidavit." *Haygood*, 356 S.W.3d at 399. Under section 18.001(e), as of the relevant time, "[a] party intending to controvert a claim reflected by the affidavit must file a counteraffidavit" with the clerk and serve it on all other parties not later than 30 days after he receives a copy of the affidavit and at least 14 days before trial evidence is first presented. Act of 1987, 70th Leg., R.S., ch. 167, 1987 Tex. Gen. Laws 1350 (amended 2013) (also permitting counteraffidavit any time before trial with court's leave). The counteraffidavit must give reasonable notice of the basis on which the opposing party intends to controvert the claim within the initial affidavit. Tex. Civ. Prac. & Rem. Code Ann. § 18.001(f) (West 2013).

Where no counteraffidavit is filed, an affidavit presented in accordance with section 18.001 is admissible. *Flynn v. Racicot*, No. 09-11-00607-CV, 2013 WL 476756, at *2 (Tex. App.—Beaumont Feb. 7, 2013, no pet.) (mem. op.); *Hong*, 209 S.W.3d at 801. Although not conclusive as to the amount of damages, a proper section 18.001 affidavit constitutes legally sufficient evidence to support findings of fact as to reasonableness and necessity. *Christus Health v. Dorriety*, 345 S.W.3d 104, 107 (Tex. App.—Houston [14th Dist.] 2011, pet. denied); *see* Tex. Civ. Prac. & Rem. Code § 18.001(b) (West 2011); *Nguyen v. Lijun Zhang*, No. 01-12-01162-CV, 2014 WL 4112927, at *7 (Tex. App.—Houston [1st Dist.] Aug. 21, 2014, no pet.) (mem. op.). Section 18.001 affidavits do not, however, establish the requisite causal link between the occurrence and the plaintiff's medical expenses. *Nguyen*, 2014 WL 4112927, at *7; *Dorriety*, 345 S.W.3d at 108; *see also* *Beauchamp v. Hambrick*, 901 S.W.2d 747, 749 (Tex. App.—Eastland 1995, no writ) (section 18.001 does not address causation).

So long as the requirements of section 18.001 are met and the opponent does not file a proper controverting affidavit, a party may dispense with the

inconvenience and expense of obtaining an expert to testify as to the necessity and reasonableness of expenses. *Rodriguez-Narrera v. Ridinger*, 19 S.W.3d 531, 532 (Tex. App.—Fort Worth 2000, no pet.).[30] By filing a proper controverting affidavit, the opposing party can prevent the offering party's affidavits from being used as evidence. *City of Laredo v. Limon*, No. 04-12-00616-CV, 2013 WL 5948129, at *6 (Tex. App.—San Antonio Nov. 6, 2013, no pet.); *Hong*, 209 S.W.3d at 801. By filing a proper controverting affidavit, the opposing party can require the offering party to prove at trial the reasonableness and necessity of past medical expenses through expert testimony. *Nguyen*, 2014 WL 4112927, at *7.

Here, a few months before trial, the Texas Supreme Court issued *Haygood v. De Escabedo*. *Haygood* involved a personal-injury case arising from a car accident. 356 S.W.3d at 392. There, 12 health care providers billed Haygood a total of $110,069.12. Because Haygood was covered by Medicare Part B, and because federal law prohibits health care providers from charging patients more than Medicare deems reasonable, Haygood's providers adjusted their bills downward, leaving a total amount due of $27,739.43. *Id.* The trial court allowed Haygood to introduce evidence of the full amounts initially billed by his providers, and the jury awarded the full amounts as past medical expenses. The court of appeals reversed. *Id.* In affirming the court of appeals, *Haygood* concluded that the collateral source rule does not allow a plaintiff to recover medical expenses a service provider is not entitled to charge. *Id.* at 396. The *Haygood* court also

---

[30] *See also Bituminous Cas. Corp. v. Cleveland*, 223 S.W.3d 485, 492 (Tex. App.—Amarillo 2006, no pet.) ("[S]ection 18.001 provides a pretrial procedure to facilitate proof of the cost and necessity of services by traditional means at trial by timely filing the statutory affidavit before trial and is otherwise sufficient to satisfy the condition precedent of the statute."); *Turner v. Peril*, 50 S.W.3d 742, 746 (Tex. App.—Dallas 2001, pet. denied) ("Section 18.001 provides a significant savings of time and cost to litigants, particularly in personal injury cases, by providing a means to prove up the reasonableness and necessity of medical expenses.").

construed section 41.0105[31] of the Texas Civil Practice and Remedies Code and reasoned that "actually paid and incurred" means "expenses that have been or will be paid, and excludes the difference between such amount and charges the service provider bills but has no right to be paid," such that section 41.0105 "limits a claimant's recovery of medical expenses to those which have been or must be paid by or for the claimant." *Id.* at 396–98. The *Haygood* court then considered whether evidence showing the full amounts the plaintiff's providers billed was admissible and determined that only evidence of recoverable medical expenses— those expenses that "have been or must be paid by or for the claimant"—is admissible. *Id.* at 398–99. Evidence of charges for which the provider is not entitled to payment is "irrelevant to the issue of damages" and inadmissible. *Id.* at 398. In addition, the jury should not be told that medical expenses will be covered in whole or in part by insurance, or that a provider adjusted its charges because of insurance. *Id.* at 400.

## 2. Proceedings in this case

This case presents a procedural wrinkle involving section 18.001 affidavits that arises because *Haygood* issued during the midst of this litigation. *Haygood* did not foreclose the use of section 18.001 affidavits. However, *Haygood* made clear that where a claimant has medical insurance coverage (there, specifically Medicare Part B): (1) recovery is limited to only those amounts that have been or must be paid by or for the claimant, excluding the difference between such amounts and charges the health care provider bills but has no right to be paid; (2) anything beyond such recoverable amounts is irrelevant and inadmissible; and (3) the jury should not hear that the claimant's medical expenses are covered by

---

[31] Section 41.0105 provides: "In addition to any other limitation under law, recovery of medical or health care expenses incurred is limited to the amount actually paid or incurred by or on behalf of the claimant." Tex. Civ. Prac. & Rem. Code Ann. § 41.0105 (West 2013).

insurance or include insurance adjustments. *Id.* at 396–400. In other words, after *Haygood*, plaintiffs like Shannon with medical insurance coverage could no longer rely on evidence of medical expenses that included any amounts beyond the levels health care providers had agreed to or otherwise had the right to be actually reimbursed by the insurers. Moreover, plaintiffs like Shannon with medical insurance coverage needed to submit evidence of recoverable amounts but without informing the jury that such amounts had been adjusted or had been or would be paid by their insurers.[32]

In March 2011, prior to *Haygood*, McCoy provided the trial court and Gunn and McCoy with records affidavits and attached billing records from Shannon's medical service providers. The billing records contained information about Shannon's insurance providers, describing them as "payers." The records also included line-item entries for insurance payments, adjustments, and allowances. Gunn and McCoy did not file any counteraffidavits.

After *Haygood* issued in July 2011, the relevance and admissibility of all of McCoy's already-submitted section 18.001 affidavits was thrown into question

---

[32] As of the time of issuance, only three appellate cases have made any mention of section 18.001 in the post-*Haygood* context. These cases, however, involved different facts. *See Katy Springs & Mfg., Inc. v. Favalora*, — S.W.3d—, No. 14-14-00172-CV, 2015 WL 5093232, at *14, 18 (Tex. App.—Houston [14th Dist.] Aug. 27, 2015, no. pet. h.) (uninsured plaintiff and trial court granted plaintiff's motion to strike counteraffidavit); *Metro. Transit Auth. v. McChristian*, 449 S.W.3d 846, 853–54 & n.2 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (uninsured plaintiff, defendant filed counteraffidavits, and expert testified as to reasonableness and necessity); *Sutton v. Helwig*, No. 02-12-00525-CV, 2013 WL 6046533, at *5 (Tex. App.—Fort Worth Nov. 14, 2013, no pet.) (mem. op.) (pro se plaintiff provided neither affidavit nor expert testimony as to reasonableness and necessity); *see also* Jamee Cotton, *How Much Are You Worth?: Why the Texas Supreme Court Took Tort Reform Too Far in Limiting the Admissibility of Certain Medical Expenses During Trial*, 45 Tex. Tech L. Rev. 565, 593–95 (2013) (discussing uncertainty and glitches in connection with attorneys offering evidence of appropriate damages via section 18.001 and also complying with *Haygood*).

42

with trial looming.[33]   In September 2011, over 50 days before trial commenced, McCoy provided the trial court and Gunn and OGA with affidavits from custodians of records for three subrogation companies and attached billing summaries of the medical care claims paid on behalf of Shannon by her insurance providers.   The first affidavit attested to payment of $61,428.69; the second affidavit attested to payment of $322,644.30; the third affidavit attested to payment of $319,912.99.   The attached billing summaries included: dates of treatment, names of providers, descriptions of the treatment or diagnostic and service codes, and paid amounts.   The three billing summaries together totaled a paid amount of $703,985.98.  Again, Gunn and OGA filed no counteraffidavits.

At trial, McCoy's counsel offered exhibits 15 through 17 related to Shannon's past medical expenses:

> MR. KLEIN: 15, 16, and 17 . . . are the billing records that have been proved up by the affidavits before and so we're offering them as having been proved up and the defendant has identified counter. Affidavits cannot contest reasonable necessary expenses and the business records and the business records affidavits are attached.  So they proved up the business records there which are indeed self-authenticated and not hearsay under Rule 803[(]6[)].

> And finally, we've proved them up under Civil Practice and Remedies Section.  The defendant offered to provide any counter affidavit and the Court particularly ruled on that particular objection. And at this time we offer 15, 16, and 17 which have been proved up.

Gunn's counsel objected that the only permissible section 18.001 affidavits were those made by medical providers and that no expert had testified whether

---

[33] In 2013, the Texas Legislature amended section 18.002 to add an additional form available for purposes of providing evidence of the reasonableness and necessity of medical expenses.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 18.002(b-1) (West 2013).  Further, the Legislature added subsection (b-2): "If a medical bill or other itemized statement attached to an affidavit under Subsection (b–1) reflects a charge that is not recoverable, the reference to that charge is not admissible." *See id.* § 18.002(b-2).

Shannon's past damages were reasonable and necessary. McCoy's counsel responded:

> These are the billing records. And what I proposed to the Court and the affidavits that are filled out by the insurers showed the amount paid to satisfy *Haygood* and it's a summary and the last page gives the total. And what I propose to do is if you will take the affidavits off and permit merely the insurer records themselves. The affidavits are to meet the requirement for the Court for evidentiary. So we tender the affidavits to the Court and won't go back to the jury, but will be part of the record when the summaries go back to the jury and they have been proved up and the business records. It's been proved up in the Civil Practice of Remedies Code and the Court has reasonably approved. It's proved up three ways.

Gunn's counsel continued to argue no expert had ever testified that the billing records "were all reasonable and necessary." The trial court overruled Gunn's and OGA's objection and admitted the billing summaries:

> MR. KLEIN: This is reasonable, necessary expenses. They don't get to contest that and if they waive that by negotiating to file a counter affidavit and that's not proper. The fourth order has been previously ruled on and her single objection is they have not proved reasonable, necessary expenses. We don't have to and have followed the rules and proved up under 80[3(]6[)] and completely admissible and going to withdraw the affidavits and submit them separately for the record and get billing records signed which are proved up and introduce those and offer those at this particular time. They don't have to be proved up by Dr. Willingham.[34] It's not required and we complied with the Rules.
>
> THE COURT: I'll admit 15, 16 and 17.
>
> MS. HILBURN: Your Honor, if I may under Rule 80[3(]6[)], the only way that these could be proved up by billing affidavit are those from the medical health care providers, giving them to an insurance company and having them provide a list.

---

[34] Dr. Alex Willingham, a physical medicine and rehabilitation physician, testified for McCoy regarding Shannon's life care plan.

THE COURT: They can't do it and they can't prove up reasonable, necessary expenses? And they can't—

MS. HILBURN: No, Your Honor.

THE COURT: You may be right and I'll—he's the plaintiff and if the evidence is right—I think he's right.

MR. FEEHAN: Your Honor, I join in the objection to 15, 16 and 17.

THE COURT: The objection is overruled and 15, 16 and 17 is admitted.

During the jury charge conference, Gunn and OGA requested that the jury be asked about the past medical expenses "actually paid or actually incurred by or on behalf of Shannon" in accordance with *Haygood* and section 41.0105. The trial court determined that it would track the current PJC. *See* Texas Pattern Jury Charges—General Negligence & Intentional Personal Torts (2010), PJC 15.3 (listing "i. *Medical care expenses* incurred in the past").

Gunn and OGA objected to the submission of jury question 2.i. on Shannon's past medical expenses:

> [T]here is legally insufficient evidence to support . . . Subpart I, medical care expenses Shannon Miles McCoy incurred in the past. We believe that the jury should be inquired about the medical and care expenses she actually—that were actually paid by or on her behalf or actually incurred by or on her behalf. And there is legally insufficient evidence in this case of the amounts that were actually paid or actually incurred under section 41.0105 of the Civil Practice and Remedies Code.
>
> THE COURT: Overruled.
>
> MS. FAUST: We would also object to the submission of Subpart I, medical expenses of Shannon Miles McCoy incurred in the past because there is legally insufficient evidence that—of the reasonableness and of the necessity for the medical expenses submitted to—in evidence in this case, Your Honor. For that reason Subpart I should not be submitted to the jury.

THE COURT: Overruled.

Gunn and OGA objected to question 2.i on no-evidence grounds and because it did not inquire as to Shannon's "paid and incurred" expenses. However, Gunn and OGA did not object that the reasonableness and necessity aspects of recovery should be included in question 2.i as discussed in the comments accompanying section 15.3 of the PJC:

> Reasonable expenses and necessary medical care. If there is a question whether medical expenses are reasonable or medical care is necessary, the following should be substituted for element[] i . . .:
>
> i. Reasonable expenses of necessary medical care incurred in the past.
>
> Answer: _____

*See id.* PJC 15.3 cmt.

Instead, question 2 asked the jury: "What sum of money, if paid now in cash, would fairly and reasonably compensate Shannon Miles McCoy for her injuries, if any, that resulted from the occurrence in question?" Subpart i. asked the jury to provide a damages amount for "Medical care expenses Shannon Miles McCoy incurred in the past." The jury provided the figure $703,985.98.

### 3. Shannon's past medical care expenses

On appeal, Gunn and OGA contend that there is no evidence of the reasonableness and necessity of Shannon's past medical expenses because the subrogation affidavits did not comply with section 18.001 and were not in evidence before the jury, and because McCoy did not provide expert testimony regarding reasonableness and necessity.[35] They do not complain of any charge error related

---

[35] On appeal, Gunn and OGA do not argue any legal-sufficiency point based on section 41.0105 and *Haygood*.

46

to Shannon's past medical expenses. Nor do they complain that reasonableness and necessity should have been submitted to the jury in question 2.i.

Gunn and OGA did not controvert McCoy's section 18.001 affidavits by filing counteraffidavits, or otherwise impugn the reasonableness and necessity of Shannon's past medical expenses.[36] Even if Gunn and OGA disputed reasonableness and necessity, they did not object that these aspects of past medical recovery should be submitted to the jury.

Consequently, we review the legal sufficiency of the evidence in light of the jury charge as given, which did not require the jury to find reasonableness and necessity. *See, e.g., St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2003) (citing *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000)); *Williard Law Firm, L.P. v. Sewell*, 464 S.W.3d 747, 751 (Tex. App.—Houston [14th Dist.] 2015, no pet.). ("It is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when, as here, there was no objection to the relevant portion of the charge.").[37]

At trial, McCoy presented the three subrogation billing summaries. Exhibit 15 is a summary by the Rawlings Company detailing paid amounts for Shannon's medical care received from listed providers from September 14, 2004 to December

---

[36] For example, Texas appellate courts have concluded that section 18.001 does not prevent a defendant who did not file a counteraffidavit from crossing a plaintiff's witnesses or presenting argument. *See Gutierrez v. Martinez*, No. 01-07-00363-CV, 2008 WL 5392023, at *12 (Tex. App.—Houston [1st Dist.] Dec. 19, 2008, no pet.) (mem. op.); *Grove v. Overby*, No. 03–03–00700–CV, 2004 WL 1686326, at *6 (Tex. App.—Austin July 29, 2004, no pet.) (mem. op.). And while they do not function as counteraffidavits, a defendant may raise a section 18.001 fact issue through custodians' depositions. *See Wald Tinkle Packaging & Distribution, Inc. v. Pinok*, No. 01-02-01100-CV, 2004 WL 2966293, at *9 (Tex. App.—Houston [1st Dist.] Dec. 23, 2004, no pet.) (mem. op.).

[37] Therefore, we do not reach Gunn and OGA's contention that, because the subrogation affidavits themselves were not in evidence before the jury, they cannot support the jury's finding that Shannon's past medical expenses were reasonable and necessary.

28, 2005. The sum of paid amounts in exhibit 15 is $61,428.69. Exhibit 16 is a summary from Meridian Resource Co., LLC detailing paid amounts for Shannon's medical care received from listed providers from September 14, 2004 to December 23, 2007. The sum of paid amounts in exhibit 16 is $322,644.30. Exhibit 17 is a summary faxed to McCoy's counsel from VWA detailing paid amounts for Shannon's medical care received from listed providers from March 6, 2006 to March 23, 2011. The sum of paid amounts in exhibit 17 is $319,912.99. The total amount paid for Shannon's past medical care expenses as reflected in these exhibits is $703,985.98.

McCoy also presented this testimony from Brewer:

Q. The kind of care [Shannon] received whether she would have gotten at Woman's Hospital or St. Luke's is something she needed?
A. I would say so.
Q. And then the care she got at TIRR, was that something she needed?
A. That's a rehab, correct? Yeah.
Q. And the care she has gotten since then for her brain damage, is that something she needed?
A. I absolutely think so.
Q. So when it comes to the cause for the need for all this medical treatment later at Woman's and then at St. Luke's and then at TIRR and afterward, was that caused by negligence of the defendant in your opinion?
A. I think so. I think we've shown that time and time again.
Q. Have all the opinions that you have given today been based on a reasonable degree of medical probability?
A. Yes, they have.

*Evidence of medical care expenses Shannon incurred in the past.* Gunn and McCoy argue that, without affidavits, the admitted subrogation summaries "lacked foundation and context" and harmed them where the jury awarded the

48

exact total of the summaries. However, they provide no authority for this position. They also cite no case law concluding that section 18.001 affidavits themselves always must be provided to the jury.[38] Here, the subrogation affidavits were not provided to the jury; they indicated that Shannon's expenses had been covered by insurance. *See Haygood*, 356 S.W.3d at 399–400 (jury should not be told amounts will be covered in whole or in part by insurance, or about provider adjustments).

Gunn and OGA further argue that the billing summaries were inadmissible and constitute no evidence because they did not comply with section 18.001. As they did below, Gunn and OGA challenge the subrogation affidavits on the basis of improper affiant, arguing that only records custodians for medical providers can attest to reasonableness and necessity. We disagree. This court recently has determined there is no requirement that an affidavit submitted under section 18.001(c)(2)(B) be made by a records custodian *for a medical provider*. *Katy Springs & Mfg., Inc. v. Favalora*, — S.W.3d—, No. 14-14-00172-CV, 2015 WL 5093232, at *16 (Tex. App.—Houston [14th Dist.] Aug. 27, 2015, no. pet. h.) (construing disjunctive "or" in section 18.001(c)(2) in rejecting argument that records custodian affiant for company engaged in business of medical accounts receivable financing or "factoring" was not a proper affiant because he was not medical provider). We conclude that the billing summaries comply with section 18.001(c)(2).

On appeal, Gunn and OGA further argue that the subrogation affidavits did not comply with section 18.001(c)(3), which provides that affidavits "include an

---

[38] Gunn and OGA cite *Nye v. Buntin*, where the Austin Court of Appeals concluded that the trial court did not abuse its discretion by excluding medical cost affidavits not timely filed and served under section 18.001(d). *See* No. 03-05-00214-CV, 2006 WL 2309051, at *2–3 (Tex. App.—Austin Aug. 11, 2006, pet. denied) (mem. op.). There is no dispute that McCoy timely provided his affidavits. Nor does *Nye* stand for the proposition that section 18.001 affidavits themselves always must be provided to the jury.

49

itemized statement of the service and charge." *See* Tex. Civ. Prac. & Rem. Code Ann. § 18.001(c)(3). For example, Gunn and OGA contend that services should have been described in more detail, payment dates are incorrect, and there was no key provided for the diagnostic and service codes. Gunn and OGA never objected in the trial court on the basis that the affidavits included improperly itemized statements of the service and charge and so waived this defect, if any. *See Marvin Frank Motor Co. v. Harris Cty.*, No. 01-02-01105-CV, 2004 WL 549487, at *2 (Tex. App.—Houston [1st Dist.] Mar. 18, 2004, pet. denied) (§ 18.001(d) timeliness objection not preserved). Moreover, if Gunn and OGA took issue with the specificity of any of the services and charges in the summaries attached to the subrogation affidavits, section 18.001 provided them with the proper procedure to controvert any claims and to provide notice of the basis of their disagreement to McCoy—filing a proper counteraffidavit.

*Evidence that Shannon's past medical expenses "resulted from the occurrence in question."* We also must determine whether there is legally sufficient evidence supporting a causal nexus between Gunn's conduct and Shannon's past medical expenses. *See Haygood*, 356 S.W.3d at 399; *Murdock*, 946 S.W.2d at 838. Gunn and OGA argue that McCoy tendered no proof connecting any of the medical expenses reflected in exhibits 15 through 17 to injuries alleged to have been sustained as a result of Gunn's negligence. Brewer provided her opinion that all the medical treatment and care Shannon received at Woman's, St. Luke's, TIRR, and "since then for her brain damage" was to a reasonable degree of medical probability caused by Gunn's negligence. This expert testimony sufficiently linked Shannon's past medical damages to the challenged medical conduct. *See Dorriety*, 345 S.W.3d at 108–10 (even though expert did not review medical bills, he testified that "but for" failures of hospital,

none of patient's subsequent medical care would have been necessary).

Gunn and OGA further argue that some of Shannon's medical care was unrelated to Gunn's negligence and that, because McCoy did not segregate such expenses, this renders his proof legally insufficient.[39] Gunn and OGA primarily rely on *Murdock*. *Murdock* was a medical malpractice case involving a child born with serious congenital defects. 946 S.W.2d at 837. The child took in some meconium while in utero. *Id.* The particular negligence at issue related to a doctor's aspiration of such meconium after birth, which caused additional complications beyond the birth defects. *Id.* There, where there were multiple conditions treated during multiple hospitalizations before the child eventually died, the Texas Supreme Court concluded that the plaintiffs needed to prove which treatments were attributable to the negligent meconium aspiration and the costs associated with those treatments. *Id.* at 840. There, the expert testimony failed to establish a causal link between all medical expenses and the particular injuries caused by the negligent aspiration. *Id.* at 841.

Within the context of a legal-sufficiency challenge, this court has distinguished *Murdock* in analogous circumstances. *Dorriety* was a medical malpractice case involving a woman with diabetes insipidus, who had been managing her condition with medication. 345 S.W.3d at 106. The patient entered the hospital complaining of shortness of breath and was admitted with a diagnosis of low sodium. *Id.* The treating doctors took her off her usual diabetes medication and ordered strict monitoring of her fluid intake and output because of concerns

---

[39] In its initial brief, OGA characterizes the lack of segregation as a factual-sufficiency point. In its reply, however, OGA indicates that its segregation complaint is a legal-sufficiency challenge. To the extent any factual-sufficiency challenge remains, after considering and weighing all the evidence, we conclude that the evidence is not so weak nor is the finding clearly wrong and manifestly unjust to set aside the verdict based on lack of segregation. *See Jackson*, 116 S.W.3d at 761–62.

51

about her sodium levels fluctuating. *Id.* The patient's fluid output began to greatly outpace her intake, but no one informed her doctors. *Id.* No one monitored her vitals overnight, and the nurses failed to report a "panic level" sodium value to her doctors for more than an hour. *Id.* at 106–07. The patient's husband found her unresponsive. *Id.* at 107. Specialists concluded nothing could be done to help the patient recover from her coma. *Id.* She was discharged to hospice care and ultimately died. *Id.* The defendant hospital challenged the jury's award for past medical expenses, arguing that some charges were incurred for items and services before the incident, and some charges incurred after the incident were unrelated to any negligence. *Id.* at 109–110.

We distinguished *Murdock* in *Dorriety* because the hospital's negligence caused the patient to suffer severe brain damage that became the focus of her medical care until her death. *Dorriety*, 345 S.W.3d at 110. In addition, unlike in *Murdock*, there was no equivocal expert testimony that only certain "therapeutic maneuvers" were related to the negligence. *Dorriety*, 345 S.W.3d at 110. We further noted the jury may have allowed that the hospital's negligence greatly complicated the treatment of the patient's underlying diabetes, and that any subsequent expenses attributable to her underlying diabetes or high blood pressure were de minimis. *Id.* at 111.

We find *Dorriety* instructive here. Shannon presented to the hospital with placental abruption and an underlying clotting disorder not attributable to Gunn's negligence. Without identifying any specific charges, Gunn and OGA contend that Shannon received treatment before Gunn's alleged negligence. However, there was evidence that from the time she took over Shannon's care at approximately 4:00 a.m. on September 14, 2004, Gunn's negligence in treating Shannon's DIC caused her to continue losing blood volume; become hemodynamically unstable,

52

which aggravated her uterine atony; and ultimately suffer severe brain damage that was and continues to be the focus of her around-the-clock medical care. *See Dorriety*, 345 S.W.3d at 109–10. Brewer similarly linked the brain injuries caused by Gunn and Shannon's subsequent medical care. *See id.* at 108, 110. Again without identifying any specific charges, Gunn and OGA assert Shannon later received treatment for a pulmonary embolism and a stroke unrelated to Gunn's negligence. However, McCoy's life care expert Dr. Alex Willingham testified there was no functional difference in the fulltime medical care Shannon required before and after she suffered these complications.[40] Therefore, the jury could have determined any additional care that could be segregated out was not worth subtracting from her total medical expenses. *See id.* at 111.

As measured against question 2.i. presented to the jury in the charge, considering only the evidence and reasonable inferences favorable to the jury's past medical expenses finding, and disregarding all evidence and inferences to the contrary because a reasonable juror could do so, we conclude that the evidence is legally sufficient to support the jury's award of $703,985.98 for Shannon's past medical expenses. We overrule Gunn's third issue and OGA's fifth issue.

**E. Shannon's future medical expenses**

Next, in two related issues, Gunn and OGA challenge the jury's award for Shannon's future medical expenses. As OGA's third issue, adopted by Gunn as her seventh issue, Gunn and OGA argue that the trial court committed reversible error by excluding the testimony of the defense's designated life care expert Dr. Helen Schilling. As Gunn's fourth issue, adopted by OGA, Gunn and OGA argue

---

[40] Gunn and OGA also contend McCoy's counsel acknowledged that Shannon suffered a foot burn several years after the occurrence. Although the trial court denied McCoy's motion in limine, Gunn and OGA did not put on any foot-burn evidence.

that the evidence is legally insufficient to support $159,854 of the jury's award.

### 1. Schilling's testimony

We first consider the exclusion of Schilling's testimony. We review a trial court's exclusion of an expert witness for abuse of discretion. *See Gammill*, 972 S.W.2d at 718–19. To establish reversible error based on the erroneous exclusion of evidence, the complaining party must prove three things: (1) the trial court erroneously excluded the evidence; (2) the excluded evidence was controlling on a material issue and not cumulative of other evidence; and (3) the error probably caused the rendition of an improper judgment. *Coterill-Jenkins v. Tex. Med. Ass'n Health Care Liab. Claim Trust*, 383 S.W.3d 581, 593 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *see* Tex. R. App. P. 44.1; *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). "[A] successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted." *Able*, 35 S.W.3d at 617. In determining if the exclusion was harmful, we review the entire record. *See id.*

Here, at trial, when Gunn and OGA sought to introduce the video deposition testimony of Schilling, McCoy objected because the video segment at issue did not contain the predicate to establish Schilling's qualifications as an expert witness. The trial court agreed and refused to allow the playing of Schilling's deposition, but acknowledged that Schilling could testify live at trial to the basis for her expertise. Gunn and OGA chose not to call Schilling as a live witness—they presented an offer of proof instead.

Gunn's and OGA's offer of proof provided details about Schilling's training and practice as a physical medicine and rehabilitation physician, her experience teaching residents in that field, her experience as a hospital medical director, her preparation of life care plans as part of her daily practice in similar areas of care as

54

Willingham prepared for Shannon, and her review of Shannon and of Willingham's prepared life care plan for Shannon. Gunn and OGA also submitted Schilling's marked-up copy of Willingham's life care plan for Shannon.

Even assuming that the trial court erred in excluding Schilling's testimony and the annotated plan, we conclude Gunn and OGA have failed to show harm. Gunn and OGA argue that they suffered harm because McCoy was able to present "unchallenged" testimony of anticipated future medical care damages. They insist that "[h]ad the jury heard Schilling's testimony, it may well have reduced its award for future damages by as much as $3.6 million." This position disregards that during direct examination Willingham acknowledged that his opinion was not unchallenged. He testified regarding Schilling's line-item annotations to his life care plan—removing some items altogether as not reasonably medically necessary and reducing the frequency or cost of others—which had the effect of reducing his projected costs. Willingham stated that Schilling's criticisms reduced his option 1 (home setting) projected costs from approximately $6.9 million to $3.3 million, and reduced his option 2 (private facility) projected costs from approximately $7.4 million to $6.7 million.[41] During cross-examination, the trial court admitted a defense exhibit consisting of Willingham's life care cost analysis. Willingham again acknowledged Schilling's differing opinions and how he came up with "those Schilling numbers." Therefore, in addition to being presented with Willingham's figures for options 1 and 2, the jury was made aware of the reduced figures attributed to Schilling and why she reduced them.

Gunn and OGA further assert that they were harmed because the jury award

[41] Schilling's main criticism of option 1 was that home health care costs should only be provided for 8, not 24, hours. Willingham explained this was not "workable" because Shannon required around-the-clock care. With regard to option 2, Schilling did not reduce the per diem facility rate. Willingham also stated that Schilling removed all therapy services. Previously in his testimony, Willingham had explained why Shannon required such therapy.

"probably included damages for future care of conditions not caused by the alleged negligence." However, as discussed previously, Willingham testified as to the lack of functional difference in the nature of the fulltime care Shannon required before and after her pulmonary embolism and stroke. Gunn and OGA also emphasize that future medical care was the largest component of the jury award; however, the key dispute throughout this case involved liability. Although she disagreed with Willingham's projections, Schilling did not dispute that Shannon required significant—several millions of dollars in—future medical care and that one available option was private facility-based care. *See Rauch v. Patterson*, 832 S.W.2d 57, 62 (Tex. App.—Houston [14th Dist.] 1992, writ denied) ("By their very nature, future medical expenses are uncertain and not subject to exact measurement."). In other words, the judgment was not controlled by nor did it turn on her testimony. *See Able*, 35 S.W.3d at 617.

Based on our review of all the evidence, admitted and excluded, we conclude that Gunn and OGA have failed to make the requisite showing that they were harmed by the trial court's evidentiary ruling. *See Coterill-Jenkins*, 383 S.W.3d at 593. We overrule OGA's third issue and Gunn's seventh issue.

**2. Legally insufficient evidence to support $7,242,403.00 award for Shannon's future medical care expenses**

Next, we consider Gunn's and OGA's argument that a specific portion of the jury award for Shannon's future medical expenses is not supported by legally sufficient evidence. Gunn and OGA specifically focus on the portion of damages in Willingham's life care plan attributable to "potential needs not within medical reasonable probability."

To recover for future medical expenses under Texas law, a plaintiff must provide evidence showing a reasonable probability that the medical expenses will

be incurred in the future, and the probable cost of such expenses. *See Whole Foods Mkt. Sw., L.P. v. Tijerina*, 979 S.W.2d 768, 781 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). Although the preferred method is through expert medical testimony, no precise evidence is required to support an award for future medical costs. *Id.* It is within the jury's sound discretion to determine what amount, if any, to award in future medical expenses. *Id.* "This standard of review, however, is not so nebulous that a reviewing court will uphold a jury award for future medical expenses when there is no evidence." *Id.* at 781–82 (internal quotation marks omitted).

During Willingham's direct, when McCoy's counsel began discussing trial exhibit 13[42]—a one-page cost analysis summary of the two options in Willingham's life care plan—Gunn and OGA objected that testimony regarding Shannon's "potential life care needs" referenced in the summary was not relevant because these needs were merely possible instead of within reasonable medical probability. Gunn and OGA also requested that the exhibit be redacted to remove this category of costs. McCoy's counsel explained the costs were relevant to show Shannon's life care plan did not include everything, but he would "be very clear" that McCoy was not seeking recovery for these potential costs. The trial court overruled the objection and granted a running objection. Willingham went on to discuss examples of costs included within the "potential care needs" category under both options and agreed that McCoy was not asking the jury to include these possible but "not likely to occur" amounts.

The next day, McCoy presented Ken McCoin, an economist who had calculated the present-day costs of Shannon's future medical expenses. When McCoy's counsel started to ask McCoin questions about a summary exhibit of

---

[42] This exhibit had been previously admitted without objection.

57

economic damages, Gunn and OGA objected to the exhibit, arguing that evidence of the present-day costs of potential future medical care needs was not relevant and would mislead the jury. McCoy's counsel again emphasized that he would "make very clear we're not asking for it time after time after time." The trial court overruled the objection, granted a running objection, and admitted exhibit 14. McCoin's testimony reflected that the present-day costs of Shannon's future expected medical expenses—adjusted for inflation and reduced to present value— for option 1 was "just over $6.6 million," and for option 2 was "slightly over $7 million." McCoin explained that the "potential" category of present-day costs for both options 1 and 2 reflected costs of $159,854.00 that were possible but not probable.

Despite McCoy's counsel's insistence that he would make it clear to the jury McCoy was only seeking reasonably probable and not potential future medical expenses, during closing he merely directed the jury to the numbers contained in exhibit 14 so that it could fill in the "most important" damages blank. Question 2.j. asked the jury to provide a damages amount for "Medical care expenses that, in reasonably [sic] probability, Shannon Miles McCoy will incur in the future." The jury provided the figure $7,242,403.00, which corresponds to the number provided in the "totals" column for option 2 on exhibit 14. However, this figure includes both the present-day costs for permissible probable expenses ($7,082,549.00) and for impermissible possible expenses ($159,854.00). We therefore sustain Gunn's fourth issue.

Because there is legally sufficient evidence to support $7,082,549.00 of the jury's damages award for Shannon's future medical expenses, we exercise our power to suggest a voluntary remittitur of $159,854.00. *See* Tex. R. Civ. P. 46.3; *Matbon, Inc. v. Gries*, 288 S.W.3d 471, 485–86 (Tex. App.—Eastland 2009, no

pet.).

## F. Jury charge issues

As OGA's fourth issue, adopted by Gunn as her fifth issue, Gunn and OGA argue that the trial court committed harmful charge error by failing to include instructions: (1) regarding not considering the conduct of the nurses; (2) on unavoidable accident; and (3) on new and independent cause.

The trial court has considerable discretion to determine proper jury instructions—we evaluate the court's decisions to submit or refuse particular instructions for abuse of discretion. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012); *Pochron v. Oleksy*, No. 14-12-00650-CV, 2014 WL 494894, at *2 (Tex. App.—Houston [14th Dist.] Feb. 6, 2014, no pet.) (mem. op.). An instruction is proper if it: (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and the evidence. *Hawley*, 284 S.W.3d at 855–56. A trial court is afforded more discretion when submitting instructions than when submitting questions. *Towers of Town Lake Condo. Ass'n, Inc. v. Rouhani*, 296 S.W.3d 290, 295 (Tex. App.—Austin 2009, pet. denied). We do not reverse a judgment based on charge error unless the error probably caused the rendition of an improper verdict. *See* Tex. R. App. P. 44.1.

### 1. Instruction to not consider the nurses' conduct

With regard to their requested instruction on not considering the nurses' conduct in considering the negligence of Gunn, Gunn and OGA rely on *Hawley* and *Sparger v. Worley Hospital, Inc.*, 547 S.W.2d 582 (Tex. 1977). Neither case controls here.

In *Hawley*, the Texas Supreme Court concluded the trial court abused its discretion where the refused instruction—that the jury should not consider the

59

conduct of a particular doctor when determining the hospital's negligence—effectively functioned as a limiting instruction to ensure that the jury was not confused about the doctor's status as an independent contractor, and not an agent of the defendant hospital. 284 S.W.3d at 863–64. In *Sparger*, a case where the jury found the defendant hospital negligent and the defendant doctor was not negligent, and specially found that the nurses were not the borrowed servants of the defendant doctor, the Court disapproved of the captain of the ship doctrine, "a false special rule of agency." 547 S.W.2d at 582–84, 585–86. There were no similar agency issues here. The jury was solely asked about Gunn's negligence and liability. Unlike in *Hawley*, the jury was not instructed that Gunn acted or failed to act through any other person as her agent, nor was there any borrowed servant issue as in *Sparger*. We conclude that the trial court did not abuse its discretion in refusing this instruction.

## 2. Instruction on unavoidable accident

Next, Gunn and OGA contend the trial court erred by refusing to submit an instruction that an occurrence may be an unavoidable accident, that is, an event not proximately caused by the negligence of any party to the occurrence. They point to Aubuchon's testimony regarding how DIC involves "little floating clots" that block off oxygen flow and defense expert Dr. Martin Steiner's testimony that the primary cause of Shannon's brain injury was DIC-induced microthrombi.

An unavoidable accident is "an event not proximately caused by the negligence of any party to it." *Reinhart v. Young*, 906 S.W.2d 471, 472 (Tex. 1995) (citing *Dallas Ry. & Terminal Co. v. Bailey*, 151 Tex. 359, 250 S.W.2d 379, 385 (1952)). The purpose of this inferential rebuttal instruction is to ensure that the jury will understand that "they do not necessarily have to find that one or the other parties to the suit was to blame for the occurrence complained of." *Id.* (citing

*Yarborough v. Berner*, 467 S.W.2d 188, 192 (Tex. 1971)). "The instruction is most often used to inquire about the causal effect of some physical condition or circumstance such as fog, snow, sleet, wet or slick pavement, or obstruction of view, or to resolve a case involving a very young child who is legally incapable of negligence." *Id.* (citing *Hill v. Winn Dixie Tex., Inc.*, 849 S.W.2d 802, 803 (Tex. 1992)). An unavoidable accident instruction must be supported by the evidence, and is proper only where there is evidence that the event was proximately caused by a condition beyond the defendant's control and not by the negligence of any party to the event. *Rouhani*, 296 S.W.3d at 300; *see Hill*, 849 S.W.2d at 803.

Here, through no fault of Gunn, Shannon presented at Woman's with placental abruption and DIC. But there was no testimony that Shannon's placental abruption and DIC were "catastrophic" complications "predetermined" to result in severe brain damage from the moment she arrived at Woman's. *Cf. Williams v. Viswanathan*, 64 S.W.3d 624, 629 (Tex. App.—Amarillo 2001, no pet.) (decedent had "catastrophic lung injury" at the time he arrived at the hospital and that his chances of living were about five percent); *Wisenbarger v. Gonzales Warm Springs Rehab. Hosp., Inc.*, 789 S.W.2d 688, 693 (Tex. App.—Corpus Christi 1990, writ denied) (development of plaintiff's decubitus ulcer was "inevitable" and "predetermined"). Instead, there was evidence that Gunn knew about, and had the ability to control the severity of, Shannon's DIC. Defense expert Dr. James Alexander, a maternal-fetal specialist, testified: "In an abruption, after delivery, a DIC will correct. You must replace [blood] products with that, but the process will stop." Kirshon had "hope" that with proper blood products Shannon's DIC would resolve post-delivery. However, there was evidence that Gunn did not properly manage Shannon's DIC through infusion of FFP to replace her clotting factors, and Gunn "fell behind" and did not adequately resuscitate Shannon's blood volume.

61

Moreover, Gunn's and OGA's requested instruction was not reasonably necessary to enable the jury to render a proper verdict. *See Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). Here, question 1 asked the jury whether Gunn's "negligence, if any," proximately caused the occurrence and instructed the jury to answer yes or no. Based on the evidence, the jury answered yes. *See Dallas Area Rapid Transit v. Morris*, 434 S.W.3d 752, 763 (Tex. App.—Dallas 2014, pet. denied) (no abuse of discretion in refusing instruction). In addition, question 1 contained a "bad result" instruction, informing the jury that it could not base its negligence finding solely on evidence of a bad result but could consider a bad result in conjunction with other evidence.[43] In other words, the jury could not base its negligence finding on solely a bad result from Shannon's placental abruption and DIC. *See Chesser v. LifeCare Mgmt. Services, L.L.C.*, 356 S.W.3d 613, 636–37 (Tex. App.—Fort Worth 2011, pet. denied) (no abuse of discretion in refusing instruction (citing *Dillard v. Tex. Elec. Coop.*, 157 S.W.3d 429, 434 (Tex. 2005)).

Finally, Gunn and OGA have not provided, nor have we located, any authority concluding that it was error to refuse to submit an unavoidable accident instruction. *See Rouhani*, 296 S.W.3d at 301 ("Significantly, though, while the supreme court has held that the trial court may, in its discretion, submit the instruction under such circumstances, it has not held that it is an abuse of discretion not to do so."). We conclude that, under these circumstances, the trial court did not abuse its discretion by refusing such instruction.

### 3. Instruction on new and independent cause

Gunn and OGA further argue that the amount of Propofol used to sedate

---

[43] We recognize that a "bad result" instruction is statutorily required, *see* Tex. Civ. Prac. & Rem. Code Ann. § 74.303(e)(2) (West 2013), and is directed more to the negligence than the causation issue, *see Williams*, 64 S.W.3d at 630.

Shannon prior to her hysterectomy, as well as Shannon's later pulmonary embolus and stroke, warranted an instruction on new and independent cause.

A new and independent cause of an occurrence is the act or omission of a separate and independent agent, not reasonably foreseeable, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question. *Hawley*, 284 S.W.3d at 856; *Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 450–51 (Tex. 2006) (plurality opinion). A new and independent cause is one that intervenes between the original wrong and the final injury such that the injury is attributed to the new cause rather than the first and more remote cause. *Dew*, 208 S.W.3d at 450.

Courts are guided by the factors set out in section 442 of the Restatement (Second) of Torts:

(a) the fact that the intervening force brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Hawley*, 284 S.W.3d at 857–58.

Having reviewed the record in light of these factors, we conclude that the trial court did not abuse its discretion by refusing to submit a new and independent cause instruction with regard to the Propofol. Any excessive dose of Propofol did not implicate a different harm than Gunn's failures where both implicated the risk of cardiac arrest; did not later appear to yield extraordinary consequences in view of the circumstances existing at the time; and did not operate independently of any situation created by Gunn's negligence where the dose would be considered "normal" but for Shannon's substantial blood loss. Even assuming the anesthesiologist acted negligently with regard to not adjusting the dosage, we cannot conclude that this act in prepping Shannon for emergency surgery was an unforeseeable force sufficient to sever the causal connection between Gunn's original act in failing to manage Shannon's blood loss situation and her brain injury. *See Hawley*, 284 S.W.3d at 857–59; *Dew*, 208 S.W.3d at 451–53; *Henley v. Crawford*, No. 04-07-00104-CV, 2008 WL 34734, at *3–6 (Tex. App.—San Antonio Jan. 2, 2008, no pet.) ("An intervening cause that is set in motion by the original wrongdoer can never supersede the original act.").

The alleged new and intervening causes of pulmonary embolism and stroke occurred over a year after Gunn's negligence and Shannon's original brain injury. Assuming that application of the Restatement factors is appropriate here, the factors do not clearly fall in favor of providing the instruction. Even if Shannon's later pulmonary embolism and stroke could be considered extraordinary consequences in view of the existing circumstances at the time and may not be considered normal results of Gunn's negligence in failing to manage Shannon's DIC, Shannon already was suffering severe brain deficiencies requiring fulltime care as of September 14, 2004, prior to these 2005 and 2007 occurrences. Further weighing against the instruction, these later conditions implicated similar risks of

brain injury and were not due to any third party's wrongful or culpable act or omission. We cannot conclude that these later intervening conditions rise to the level of superseding causes. *See Hawley*, 284 S.W.3d at 857–59; *Dew*, 208 S.W.3d at 451–53; *Henley*, No. 04-07-00104-CV, 2008 WL 34734, at *3–6. Therefore, the trial court did not abuse its discretion in refusing to submit this instruction with regard to Shannon's later medical complications.[44]

We overrule OGA's fourth issue and Gunn's fifth issue.

## G. Indemnification

Finally, as Gunn's sixth issue, she argues that "OGA's claim for common-law indemnity will not be ripe until there is a final judgment payable on appeal." Essentially, Gunn's position is that OGA is not permitted to pursue inconsistent positions—that Gunn was not negligent but OGA is entitled to indemnity from her—simultaneously after verdict.

While an indemnitor may bring an indemnity cause of action prior to accrual, such cause of action accrues when "the indemnitee's liability to the party seeking damages becomes fixed and certain, generally by a judgment." *See Am. Star Energy & Minerals Corp. v. Stowers*, 457 S.W.3d 427, 432–33 (Tex. 2015) (citing *Ingersoll–Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 208–09 (Tex. 1999) (internal quotation marks omitted)). Gunn has not provided us with, and we have not located, any authority indicating that an indemnity claim only ripens when any related liability appeal is completed. We conclude that OGA's common-law indemnity claim was ripe for determination when the trial court rendered its

---

[44] Gunn includes—without any briefing—an additional subissue regarding the trial court's alleged harmful error in "refusing to instruct the jury" on comparative responsibility. We already have determined that the court did not err by granting no-evidence summary judgment on this affirmative defense. We overrule this subissue.

judgment against Gunn. Gunn presents no other argument for reversal of the trial court's indemnity finding. Nor has Gunn challenged the trial court's finding that OGA was vicariously liable for the negligence of Gunn based on respondeat superior. We overrule Gunn's sixth issue.

### III.  CONCLUSION

We conclude that the evidence is legally insufficient to support the award of $7,242,403.00 in damages for Shannon's future medical expenses, but the evidence is legally sufficient to support an award of future medical expenses of $7,082,549.00. We suggest a remittitur of $159,854.00. If McCoy files in this court such suggested remittitur within 20 days after the issuance of our opinion, we will modify the trial court's judgment to reduce the award of future medical expenses to $7,082,549.00, and affirm the judgment as modified. If the remittitur is not timely filed, then we will let stand our current judgment reversing the trial court's judgment and remanding the cause for a new trial.


/s/ Marc W. Brown
   Justice


Panel consists of Justices Boyce, Jamison, and Brown.

66